## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| CTP INNOVATIONS, LLC, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CENVEO CORPORATION, | : | |
| Defendant | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                    (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.        ( )

| | | |
|---|---|---|
| **6/11/2015** | | **Plaintiff** |
| **Date** | **Attorney-at-law** | **Attorney for** |
| **(856) 232-1600** | **(856) 232-1601** | **rmckinley@lauletta.com** |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02)**

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a) The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b) In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c) The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d) Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e) Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

JS 44-TXND   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CTP Innovations, LLC

**(b)** County of Residence of First Listed Plaintiff   Hamilton County, IN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert A. McKinley (PA 82538)
Lauletta Birnbaum, LLC
591 Mantua Blvd., Suite 200, Sewell, NJ 08080; (856) 232-1600

## DEFENDANTS
Cenveo Corporation

County of Residence of First Listed Defendant   Bucks County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights ☒ 830 Patent | ☐ 450 Commerce ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. § 271
Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED PENDING OR CLOSED CASE(S)
IF ANY         *(See instructions):*
JUDGE   Marvin J. Garbis         DOCKET NUMBER   MDL 14-MD-2581

DATE   June 11, 2015

SIGNATURE OF ATTORNEY OF RECORD   Robert A. McKinley

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 716 Adams Street, #H, Carmel, IN  46032

Address of Defendant: 3001 State Street, Croydon, PA  19021

Place of Accident, Incident or Transaction:   Croydon, PA
(*Use Reverse Side For Additional Space*)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes ☐          No ■

Does this case involve multidistrict litigation possibilities?          Yes ■          No ☐

*RELATED CASE, IF ANY:*
Case Number:  MDL 14-MD-2581          Judge   Marvin J. Garbis          Date Terminated:

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
          Yes ☐          No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
          Yes ☐          No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
          Yes ■          No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
          Yes ☐          No ☐

CIVIL: (Place √ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ■ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases (Please specify)
11. ☐ All other Federal Question Cases
(Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify)

## ARBITRATION CERTIFICATION
(*Check Appropriate Category*)

I,   Robert A. McKinley                    , counsel of record do hereby certify:
  ■ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
  ■ Relief other than monetary damages is sought.

DATE:    6/11/15                              _____          PA82538
                                        Attorney-at-Law                 Attorney I.D.#
          **NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:    6/11/15                              _____          PA82538
                                        Attorney-at-Law                 Attorney I.D.#

CIV. 609 (5/2012)

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: <u>716 Adams Street, #H, Carmel, IN  46032</u>

Address of Defendant: <u>3001 State Street, Croydon, PA  19021</u>

Place of Accident, Incident or Transaction: <u>Croydon, PA</u>
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes ☐          No ■

Does this case involve multidistrict litigation possibilities?                                                                Yes ■          No ☐

*RELATED CASE, IF ANY:*
Case Number: <u>MDL 14-MD-2581</u>          Judge <u>Marvin J. Garbis</u>          Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                                                                                     Yes ☐          No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                                                                                     Yes ☐          No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                                                                                                     Yes ■          No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                                                                                     Yes ☐          No ☐

CIVIL: (Place √ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ■ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases (Please specify)
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, <u>Robert A. McKinley</u>, counsel of record do hereby certify:
■ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
■ Relief other than monetary damages is sought.

DATE:   <u>6/11/15</u>                                                                          <u>PA82538</u>
                                        Attorney-at-Law                                        Attorney I.D.#
              **NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:   <u>6/11/15</u>                                                                          <u>PA82538</u>
                                        Attorney-at-Law                                        Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CTP INNOVATIONS, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Civil Action No. _____ |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| CENVEO CORPORATION, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff CTP Innovations, LLC, for its Complaint against Defendant Cenveo Corporation, states as follows:

### I.   PRELIMINARY STATEMENT

This lawsuit is one of over forty lawsuits that Plaintiff CTP Innovations, LLC ("CTP") has filed in district courts throughout the United States over the past eighteen months. In each of those cases, CTP asserted infringement of at least U.S. Patent Nos. 6,611,349 (the "'349 Patent"). The vast majority of those cases have been resolved and dismissed. The Judicial Panel on Multidistrict Litigation (the "Panel") consolidated the remaining cases before the District of Maryland in *In re: CTP Innovations, LLC Patent Litigation*, Case No. MDL 14-MD-2581. This Complaint, therefore, is a "tag-along filing" that should be consolidated under MDL 14-MD-2581.

A group of third-party manufacturers filed two petitions for *inter partes* review of the '349 Patent with the Patent Trial and Appeal Board of the United States Patent and Trademark Office ("PTAB"). Based on the petitions, PTAB instituted *inter partes* reviews of all of the claims of the '155 Patent and claims 1-3 and 10-13 of the '349 Patent. PTAB declined to

institute *inter partes* review of claims 4-9 of the '349 Patent. PTAB later denied a motion for rehearing and again declined to institute *inter partes* review of claims 4-9 of the '349 Patent.

Plaintiff asserts infringement against Defendant in this case of claim 4 and potentially claims 5 through 9 of the '349 Patent upon further discovery. At this time, Plaintiff does not assert infringement of claims 1-3 and 10-13 of the '349 Patent. CTP will notify the District of Maryland regarding the filing of this Complaint. Plaintiff anticipates that this matter will be promptly transferred for consolidation with MDL 14-MD-2581.

## II. THE PARTIES

1.    Plaintiff CTP Innovations, LLC ("CTP") is a Delaware limited liability company.

2.    Upon information and belief, Defendant Cenveo Corporation, ("Defendant") is a Connecticut corporation with a Printing and Packaging facility, located at 3001 State Street, Croydon, Pennsylvania 19021. Therefore, Defendant does business in a consistent and ongoing basis in Pennsylvania, including in this district. Defendant may be served with process at 3001 State Street, Croydon, Pennsylvania 19021.

## III. NATURE OF ACTION

3.    This is a patent infringement action to stop Defendant's infringement of the '349 Patent.

## IV. JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because it arises under the Patent Laws of the United States, United States Code, Title 35.

5.    Venue is proper in this district under 28 U.S.C. §§ 1391(c) and 1400(b). On information and belief, Defendant has a regular and established place of business in this district,

has transacted business in this district, and/or has committed acts of patent infringement in this district.

6.     On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Pennsylvania Long Arm Statute, due at least to its substantial business in this forum including but not limited to: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Pennsylvania and in this district.

## V.   GENERAL SUMMARY OF THE TECHNOLOGY AT ISSUE

7.     The invention in the '349 Patent relates generally to the field of publishing and printing.

8.     More specifically, the invention relates to systems and methods of providing publishing and printing services via a communication network involving computer to plate technology.

9.     Simplistically, computer to plate technology involves transferring an image to printing plate without the middle step of creating a film of the image that is imprinted on the plate.  The plate is then used in a printing press to transfer the image to different types of media, for example, but not by way of limitation, newspaper, card stock, or standard paper.  By directly transferring the image to the plate, the printing company eliminates the need for film and related developer chemicals, improves image quality, and may produce plates more quickly.   The claimed methods and systems provide a solution for communicating and managing printing and publishing services without the need to physically transfer copies of design files and proofs through workflows that result in the generation of a plate ready file.

3

## VI.  BACKGROUND OF THE INVENTION IN THE '349 PATENT

10.    Key steps for producing printed materials using a plate process include (1) preparing copy elements for reproduction, (2) prepress production, (3) platemaking, (4) printing, and (5) binding, finishing and distribution.

11.    In the printing production process, an "end user" prepares copy elements for reproduction. In this "design" stage of the printing process, the end user provides images and data using slides or computer files to create one or more "pages." Pages can be designed using computer programs such as QuarkXpress, Adobe InDesign, Adobe Illustrator, Photoshop, or other printing or publishing software packages. Prior to the invention claimed in the '349 Patent, slides or computer disks containing pages to be printed were sent (via mail or express carrier) to be prepared for creation of a plate.

12.    In the prepress production stage, the end user input (or "copy") is transformed into a medium that is reproducible for printing.  Typically, prepress involves typesetting, illustration, page building and design, image capture, image color correction, file conversion, RIPing, trapping, proofing, imposition, filmsetting, and platesetting.  "Proofing" involves producing a proof, or sample, of what the printed product will look like. Prior to the invention claimed in the '349 Patent, the proof was sent by mail or express carrier to the end user for review and approval.  After alterations are made, new proofs are sent to the end user. Once approval of the proof is given by the end user, a medium, such as a computer to plate (CTP) file is produced and sent to the printer.  "Imposition" involves the set of pages on a particular plate as well as their positioning and orientation. Imposition is particularly important in the creation of booklets or catalogs, where pages are positioned using register marks to assist in the stripping, collating, and folding of the printed product.

13.   In the platemaking stage, a "printer" manufactures a printing plate using the medium created during prepress.  In the printing stage, the printer uses the printing plate to create the printed product.  In the binding, finishing and distribution stage, the printed product is prepared in its final form.

14.   Each step in the printing production process described briefly above can be accomplished using a variety of different known systems and techniques.  Nevertheless, such conventional systems have many delays, particularly in the transporting of pages and proofs to and from the end user and prepress provider.  Due to delays and the fragmented nature of conventional printing production systems, errors often occur.   Further, typical printing production systems are limited in their ability to re-purpose data, manage content of pages, and piece together individual processes or tasks to establish an efficient production system or "workflow".  Indeed, no conventional system prior to the invention claimed in the '349 Patent combines prepress, content management, infrastructure (server, storage & distribution) and workflow services.

15.   Prior to the invention claimed in the '349 Patent, conventional printing and publishing systems generally include Macintosh computers or workstations which communicate with each other using the AppleTalk protocol.   AppleTalk protocol could not, however, be communicated over switched networks such as the Internet and private networks where nodes in the network have IP (Internet Protocol) addresses.   As such, conventional systems could not merely be coupled to a communication network for remotely controlling design, prepress and print processes.

16.   Prior to the invention claimed in the '349 Patent, there was a need for a system which combines design, prepress, content management, infrastructure (server, storage &

5

distribution) and workflow. For end users in particular, there was a need for a system and a method to gain control of the design, prepress, and print processes. To save time and costs, there was a need to eliminate manual shipping of proofs back and forth to a prepress provider. Further, there was a need for a prepress capability at a local facility without the time and costs of shipping proofs back and forth to a prepress provider. Even further, there was a need for a system and method to provide plate-ready files over a communications network for delivery to a CTP device. Moreover, for commercial printers, there was a need for a system and method to remotely drive a plate-setting device located at a printer's facility. Further, there was a need to decrease the amount of time necessary to generate printing plates after processing of the pages (i.e., the cycle time). Even further, there was a need for providing access to the functionality of high-end server, storage, and networking equipment to the printer facility without the associated capital investments.

## VII. *INTER PARTES* REVIEW

17.     On July 29, 2013, Printing Industries of America ("PIA") filed a petition to institute an *inter partes* review proceeding with the United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB"). That case was captioned *Printing Industries of America v. CTP Innovations, LLC* (Case No. IPR2013-00474) ("IPR2013-00474").

18.     In IPR2013-00474, the petitioner challenged the validity of each and every claim in the '349 patent.

19.     On December 31, 2013, PTAB found that the petition in IPR2013-00474 did not demonstrate that there was a reasonable likelihood that the petitioner would prevail with respect to invalidating at least one of the claims in the '349 Patent.

20.     A true and correct copy of PTAB's determination in IPR2013-00474 is attached hereto as **Exhibit 1**.

21.     On May 20, 2014, Eastman Kodak Company, Agfa Corporation, Esko Software BVBA and Heidelberg, USA filed *inter partes* review petitions IPR2014-00790 and IPR2014-00791 seeking review of all the claims of the '349 Patent.

22.     On November 28, 2014, the PTAB took up the petitions and instituted review of claims 1-3 and 10-14 of the '349 Patent.   Claims 4-9 of the '349 Patent are not part of the instituted review. A true and correct copy of the decision denying review of Claims 4-9 of the '349 is attached hereto as **Exhibit 2**.

23.     On December 12, 2014, Eastman Kodak Company, Agfa Corporation, Esko Software BVBA and Heidelberg, USA requested rehearing of the denial to institute *inter partes* review of claims 4-9 of the '349 Patent.   On March 31, 2015, PTAB denied the request for rehearing and reaffirmed the denial to institute *inter partes* review of claims 4-9 of the '349 Patent.   A true and correct copy of denial of the request for rehearing is attached hereto as **Exhibit 3**.

24.     PTAB's repeated denials of petitions to institute *inter partes* review of claims 3-9 of the '349 Patent should be given great weight in viewing the strength and validity of those claims.

### VIII.  INFRINGEMENT OF THE '349 AND '155 PATENTS IS "UBIQUITOUS"

25.     Upon information and belief, PIA is the largest trade association representing the printing and graphic communications industry in the United States.

26.     Michael Makin, president and CEO of PIA (petitioner in IPR2013-00474) testified before the Senate Committee on the Judiciary, that the inventions in the '349 and '155 Patents

> relate[ ] to how a digital file, like a PDF file, is handled and manipulated in a print production operation up until the time it is used to image a printing plate.  This method of digital workflow and plate imaging was new in the 1990s when the patent was issued but has become ubiquitous in the industry now.

Statement of Michael F. Makin, MBA, President & CEO of Printing Industries of America, Before the Senate Committee on the Judiciary, titled "Protecting Small Business and Promoting Innovation by Limiting Patent Troll Abuse," dated December 17, 2013 (the "PIA Statement"), at 4-5 (emphasis in original).  A true and correct copy of the PIA Statement is attached hereto as **Exhibit** 4.

27.   In so making this statement, it is clear that Makin and PIA were able to determine from the face of the '349 Patent that infringement of the '349 Patent was "ubiquitous in the industry now."

## IX.  CAUSES OF ACTION

### COUNT I

28.   CTP incorporates the preceding paragraphs 1-25 as though fully set forth herein.

29.   CTP owns, by assignment, the '349 Patent entitled "System and Method of Generating a Printing Plate File in Real Time Using a Communication Network."   A true and correct copy of the '349 Patent is attached hereto as **Exhibit 5**.

30.   Upon information and belief, Defendant, in violation of 35 U.S.C. § 271, has infringed, literally or through the doctrine of equivalents, and continues to infringe at least claim 4 of the '349 Patent and likely claims 5-9 of the '349 Patent as well through Defendant's using a method of generating a plate-ready file configured for the creation of a printing plate, said plate-file being associated with page layouts and being provided in real time from a remote location using a communication network and selling and offering services that include this method (the "Infringing Services").

31.     Defendant has not given the Infringing Services a specific and publicly-available name. Accordingly, Plaintiff cannot provide the name used by Defendant for such services without the benefit of discovery.

32.     Exemplary Infringing Services include, without limitation, systems and methods used by Defendant in connection with, at least, its offset sheet-fed and web printing services that involve workflows related to plate-ready files and/or the generation of such files.

33.     Exemplary Infringing Services do not include variable data printing because that type of printing does not involve the generation of a plate-ready file.

34.     Defendant has sufficient experience and knowledge of computer to plate technology generally, and of its systems and methods specifically, to determine which of its systems and methods involve the generation of plate-ready files.

35.     Defendant has sufficient experience and knowledge of computer to plate technology generally, and of its systems and methods specifically, to determine which of its systems and methods do not involve the generation of plate-ready files.

36.     Defendant has had constructive and actual notice of the '349 Patent due to the significant publicity in the printing industry regarding the '349 Patent and lawsuits involving allegations of infringement of the '349 Patent.

37.     Upon information and belief, Defendant was a member of PIA on December 17, 2013, when PIA's CEO, Mr. Makin testified before Congress. PIA issued a number of press releases regarding Mr. Makin's testimony, and during his testimony he directly referenced a cease and desist letter sent by CTP's counsel to an alleged infringer.

38.     On information and belief, Defendant will continue to infringe the '349 Patent unless enjoined by this Court.

39.    On information and belief, Defendant's infringement of the '349 Patent is, has been, and continues to be willful and deliberate in whole or in part because Defendant was aware of the '349 Patent from the substantial publicity in the printing industry relating to the '349 Patent, Defendant's membership in PIA, and Mr. Makin's testimony and related press releases. Defendant has also received this Complaint, and upon information and belief, yet continues to engage in its infringing conduct or at a minimum, has not informed CTP, CTP's counsel, or the Court that the infringement has ceased.

40.    As a direct and proximate result of Defendant's infringement of the '349 Patent, CTP has been and continues to be damaged in an amount yet to be determined.

41.    Unless Defendant's ongoing infringement is enjoined, CTP will suffer irreparable injury for which there is no adequate remedy at law.

42.    This is an exceptional case such that CTP should be entitled to its reasonable attorney fees and expenses incurred in prosecuting this action and defending any counterclaims brought by Defendant.

## IX.  REQUEST FOR RELIEF

Wherefore, CTP requests the following relief:

1.    A judgment in favor of CTP that Defendant has infringed claims 4-9 of the '349 Patent and that such infringement was willful;

2.    A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all other actors acting in active concert therewith from infringing the '349 Patent;

3.    A judgment and order requiring Defendant to pay CTP its damages in an amount not less than a reasonable royalty, treble damages, costs, expenses, and prejudgment and post-

judgment interest for Defendant's infringement of the '349 Patent, as provided under 35 U.S.C. § 284;

4.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285, and awarding to CTP its reasonable attorney fees and expenses; and

5.    Any and all other relief that the Court deems just and proper.

## X. JURY DEMAND

CTP requests a jury for all issues so triable.

Respectfully submitted,

Robert A. McKinley (PA 82538)
Lauletta Birnbaum, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone:  (856) 232-1600
Facsimile:  (856) 232-1601
Email:  rmckinley@lauletta.com

*Counsel for Plaintiff CTP Innovations, LLC*

OF COUNSEL:

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

Samuel F. Miller, TN Bar No. 22936
Maia T. Woodhouse, TN Bar No. 30438
Baker Donelson Center, Suite 800
211 Commerce Street
Nashville, Tennessee 37201
Telephone:  (615) 726-5594
Facsimile:  (615) 744-5594
Email:  smiller@bakerdonelson.com
Email:  mwoodhouse@bakerdonelson.com

L. Clint Crosby, GA Bar No. 197877
Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone:  (678) 406-8702

Fax:  (678) 406-8802
Email:  ccrosby@bakerdonelson.com

*Counsel for Plaintiff CTP Innovations, LLC*

# EXHIBIT 1

Trials@uspto.gov
Tel: 571-272-7822

Paper 16
Entered: December 31, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

PRINTING INDUSTRIES OF AMERICA
Petitioner

v.

CTP INNOVATIONS, LLC
Patent Owner

---

Case IPR2013-00474
Patent 6,611,349

---

Before HOWARD B. BLANKENSHIP, BENJAMIN D. M. WOOD, and
BRIAN J. MCNAMARA, *Administrative Patent Judges.*

WOOD, *Administrative Patent Judge.*

DECISION
Denying Petition to Institute *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00474
Patent 6,611,349

## I.  INTRODUCTION

### A.  *Background*

Printing Industries of America ("PIA" or "Petitioner") filed a petition
(Papers 3, 4,[1] "Pet.") to institute an *inter partes* review of claims 1-14 (the
"challenged claims") of U.S. Patent No. 6,611,349 (Ex. 1101, "the'349 patent").
CTP Innovations, LLC ("CTP" or "Patent Owner") filed a Preliminary Response
(Paper 11, "Prelim. Resp.").  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C.
§ 314(a), which provides as follows:

> THRESHOLD – The Director may not authorize an inter partes
> review to be instituted unless the Director determines that the
> information presented in the petition filed under section 311 and any
> response filed under section 313 shows that there is a reasonable
> likelihood that the petitioner would prevail with respect to at least 1 of
> the claims challenged in the petition.

Upon consideration of the Petition, the Preliminary Response, and the
exhibits attached thereto, we determine that Petitioner has not shown a reasonable
likelihood that the Petitioner would prevail with respect to at least one of the
challenged claims.  Accordingly, we do not authorize an *inter partes* review to be
instituted as to the challenged claims.

### B.  *Related Proceedings*

In Appendix B of the Petition, PIA identifies 35 co-pending infringement
actions involving the '349 patent.  Pet., App. B.  PIA has also petitioned for *inter*

---

[1]  The Petition cover sheet and tables of contents, authorities and exhibits
were submitted separately from the body of the Petition, and have been collectively
designated Paper 3.  The body of the Petition has been designated Paper 4.

2

Case IPR2013-00474
Patent 6,611,349

*partes* review of another patent at issue in the co-pending litigation, U.S. Patent
No. 6,738,155. *See* IPR2013-00489, Papers 4, 5 (Aug. 2, 2013).

### C.    The '349 Patent

The '349 patent relates to "a system and method of providing publishing and
printing services via a communication network." Ex. 1101, 1:9-10. According to
the '349 patent, "[k]ey steps for producing printed materials using a plate process
include (1) preparing copy elements for reproduction (the "design" stage), (2)
prepress production, (3) platemaking, (4) printing, and (5) binding, finishing and
distribution." *Id.* at 1:12-15. In the first step, an end user – e.g., a publisher, direct
marketer, advertising agency, or corporate communication department – uses a
desktop publishing program such as "QuarkXpress" to design "pages" from image
and data files. *Id.* at 1:16-25. In the prepress production stage, the user-created
pages (also called "copy") are "transformed into a medium that is reproducible for
printing." *Id.* at 1:26-28. This transformation typically involves typesetting, image
capture and color correction, file conversion, "RIPping, proofing, imposition,
filmsetting, and platesetting." *Id.* at 1:29-32.

"RIPping" is based on the acronym "RIP," which stands for raster image
processor. *Id.* at 7:57-59. A RIP is a hardware or software component that
"rasterizes" an image file – i.e., converts it to a "bitmap" or raster image. *Id.*
"RIPping" is, therefore, synonymous with rasterizing. A bitmap "is a digitized
collection of binary pixel information that gives an output device, such [as a
printer, proofer or platesetter,] the ability to image the file to paper, film or plate."
*Id.* at 7:59-62. "Proofing" involves creating a sample of the finished product that
is sent to the end user for approval. *Id.* at 1:32-35. "Imposition" involves
arranging multiple pages into a single flat that can be used to create a printing

Case IPR2013-00474
Patent 6,611,349

plate. *Id.* at 1:38-40.  According to the '349 patent, imposition "is particularly important in the creation of booklets or catalogs, where pages are positioned using register marks to assist in the stripping, collating, and folding of the printed product." *Id.* at 1:41-44.  A printer makes a plate based on the imposed flat and uses the plate on a printing press to reproduce the product; the product is bound, finished and distributed to create the product in its final form. *Id.* at 1:45-51.

The '349 patent describes and claims a publishing and printing system in which "system components are installed at an end user facility, a printing company facility, and a central service facility," each connected to the others via a communication network. *Id.* at 2:31-36, 51-56.  Figure 1, reproduced below, depicts an embodiment of the claimed invention:



Figure 1 depicts end user facility 300, printing company facility 400, and central service facility 105 connected together via either private network 160 or public network 190. *Id.* at Fig. 1.  In this embodiment, end user facility 300

4

comprises a router, desktop computer for page-building operations, and a color proofer and black and white printer for high-resolution proofing. *Id.* at 7:38-40; Figs. 1, 2, 5. Printing company facility 400 comprises a router, a hub, a server, a laser printer, a color plotter, and a platesetter, and performs production management, digital plate-making, desktop imposition, and press services. *Id.* at 8:31-33; 9:38-43; Figs. 1, 4, 5. Central service facility 105 comprises a server, "hierarchical storage management" (HSM) system 120, "digital content management" system 130, and local area network (LAN) 150. *Id.* at 5:40-50. An end user can store files in HSM system 120 to reduce storage needs at the end user facility. *Id.* at 7:19-23, 38-40.

### D.  *Exemplary Claims*

Claims 1-4 and 10 are independent.  Claims 1-3 are drawn to printing and publishing systems comprising an end user facility, a central service facility, and a printing company facility. Ex. 1101, 21:18-22:30. Claims 4 and 10 are drawn to methods of generating a plate-ready file configured for the creation of a printing plate. *Id.* at 22:31-48; 23:3-17. Claims 5-9 depend from claim 4. *Id.* at 22:49-23:2. Claims 11-14 depend, either directly or indirectly, from claim 10. *Id.* at 24:1-15.

Claims 1 and 4, reproduced below, are illustrative of the claimed subject matter:

> 1. A printing and publishing system which generates a printing plate-ready file from data provided remotely in real time using a communication network, the printing and publishing system comprising:
>
> an end user facility coupled to a communication network, the end user facility providing page building operations, the page building operations including the design and construction of pages from images, text, and data available via said communication network;

a central service facility coupled to said communication network, the central service facility providing storage, file processing, remote access, and content management operations; the file processing operations including generating a plate-ready file from pages designed at said end user facility, said plate-ready file having a file format capable of high resolution and ready for creation of a printing plate;

a printing company facility coupled to said communication network, the printing company facility providing printing operations, the printing operations including producing a printing plate from said plate-ready file; and

wherein the end user facility further comprises a communication routing device coupling the end user facility to the communication network, a computer which performs page building operations, and a proofer which provides printed samples of pages.

4. A method of generating a plate-ready file configured for the creation of a printing plate, said plate-ready file being associated with page layouts and being provided in real time from a remote location using a communication network, the method comprising:

remotely providing access to imaging files for searching and retrieving images used in the design of a page layout be a remote user,

establishing links to said image files, thereby creating a thin Postscript file from the page layout designed by the remote user;

parsing said thin Postscript file to extract data associated with low resolution images and replace with high resolution data, thereby forming a fat Postscript file,

creating a portable document format (PDF) file from said fat Postscript file, and

converting said PDF file to a file in plate-ready format.

Case IPR2013-00474
Patent 6,611,349

### E.  Prior Art Relied Upon

PIA relies upon the following prior-art references:

| | | | |
|---|---|---|---|
| Nusbickel | US 6,119,133 | Sep. 12, 2000 | Ex. 1103 |
| Lucivero | US 7,242,487 | July 10, 2007 | Ex. 1106 |
| Sands | US 5,634,091 | May 27, 1997 | Ex. 1107 |
| Benson | EP App. 0878303 | Nov. 18, 1998 | Ex. 1108 |
| Dorfman | EP App. 0920667 | June 9, 1999 | Ex. 1115 |

The Seybold Report on Publishing Systems, Vol. 27, No. 4 (Seybold Publications Oct. 27, 1997) (Ex. 1109) ("Seybold Vol. 27");

RICHARD M. ADAMS II ET AL., COMPUTER-TO-PLATE: AUTOMATING THE PRINTING INDUSTRY (Graphic Arts Technical Foundation 1996) (Ex. 1110) ("Adams II");

ALDUS CORP., OPI™ OPEN PREPRESS INTERFACE SPECIFICATION 1.3 (1993) (Ex. 1111) ("Aldus");

MATTIAS ANDERSSON ET AL., PDF PRINTING AND PUBLISHING, THE NEXT REVOLUTION AFTER GUTENBERG (Micro Publishing Press 1997) (Ex. 1112) ("Andersson");

The Seybold Report on Publishing Systems, Vol. 26, No. 20 (Seybold Publications Jul. 21, 1997) ("Seybold Vol. 26") (Ex. 1113);

Stephen N. Zilles, *Using PDF for Digital Data Exchange*, TAGA PROCEEDINGS 1997 (Ex. 1114) ("Zilles").

### F.  Asserted Grounds of Unpatentability

PIA contends that the challenged claims are unpatentable under 35 U.S.C. §§ 102 and/or 103 based on the following specific grounds (Pet. 18-60):[2]

---

[2] PIA also contends that claim 3 is indefinite under 35 U.S.C. § 112, paragraph 2. Pet. at 30-32. However, under 35 U.S.C. § 311(a) "[a] petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." We therefore do not consider PIA's asserted ground of unpatentability raised under § 112.

Case IPR2013-00474
Patent 6,611,349

| References[s] | Basis | Claims Challenged |
|---|---|---|
| Lucivero | § 102 | 1 |
| Nusbickel and Lucivero | § 103 | 1 |
| Nusbickel, Sands, and Benson | § 103 | 1 |
| Nusbickel, Lucivero, Seybold Vol. 27, and Adams II | § 103 | 2 |
| Lucivero, Nusbickel, and Sands | § 103 | 3 |
| Lucivero, Sands, Aldus, Andersson, Seybold Vol. 26, and Adams II | § 103 | 4, 7 |
| Lucivero, Sands, Zilles, and Andersson | § 103 | 10-14 |
| Lucivero, Sands, Aldus, Andersson, and Dorfman | § 103 | 5, 6 |
| Lucivero, Sands, Aldus, Andersson, and Benson | § 103 | 8, 9 |

## II.    ANALYSIS

### A.    Claim Construction

As a step in our analysis for determining whether to institute a trial, we determine the meaning of the claims. Consistent with the statute and the legislative history of the AIA, the Board will interpret claims using the broadest reasonable construction. 37 C.F.R. § 100(b). We presume that claim terms retain their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). That presumption may be rebutted if the patent specification defines the term with reasonable clarity, deliberateness, and precision. *In re Paulson*, 30 F.3d 1475, 1480 (Fed. Cir. 1994); *see also In re Bigio*, 381 F.3d 1320, 1325-26 (Fed. Cir. 2004) ("Absent claim language carrying a

Case IPR2013-00474
Patent 6,611,349

narrow meaning, the PTO should only limit the claim based on the specification or prosecution history when those sources expressly disclaim the broader definition."). If the specification does not expressly or implicitly define a claim term, it is appropriate to consult a general dictionary definition of the word for guidance in determining the ordinary and customary meaning of the claim term as viewed by a person of ordinary skill in the art. *Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010).

PIA proposes specific constructions for eight claim terms, which are summarized below:

| Claim Term | Proposed Interpretation | Claims |
|---|---|---|
| end-user facility | facility that provides page building operations allowing the design and construction of pages from images, text, and data available via a communication network. Pet. 6. | 1-3 |
| communication network | both a private network 160 (ATM network) and a public network 190 (the Internet) of subscribers and non-subscribers to a printing and publishing system connected to central service facility 105. Pet. 6. | 1-14 |
| central service facility | providing storage, file processing, remote access, and content management operations. Pet. 7. | 1-3 |
| printing company facility | providing printing operations for producing a plate from said plate-ready file. Pet. 7. | 1-3 |
| communication routing device | routers and switches . . . included at central service facility 105, end user facility 300, and printing company facility 400. Pet. 7. | 1, 3 |
| plate-ready file | a file containing pages designed from images, texts, and data converted to a digital file for producing a printing plate | 1-14 |
| thin Postscript file | digital file containing low resolution | 4-9 |

Case IPR2013-00474
Patent 6,611,349

| Claim Term | Proposed Interpretation | Claims |
|---|---|---|
|  | images, graphics, texts, and art |  |
| fat Postscript file | digital file containing high resolution images, graphics, texts, and art | 4-9 |

CTP does not dispute PIA's proposed interpretations. *See generally* Prelim. Resp. Further, the proposed interpretations do not appear unreasonable at this stage of the proceeding. Therefore, we adopt PIA's proposed constructions for purposes of this decision.

B.   *Claim 1 – Anticipation – Lucivero*

PIA contends that Claim 1 is anticipated by Lucivero under 35 U.S.C. § 102(e).

1.   *Lucivero*

Lucivero discloses a system for creating, storing and processing raster data files. Ex. 1106, Abs; 6:26-28. The system allows an end user to control the workflow of bitmap files to a plurality of user-selectable output devices. *Id.* at 7:60-63, 8:30-35. The system comprises at least one terminal device on which an end user can create PostScript[3] image files, at least one RIP for converting PostScript files into bitmap files, and a print drive for receiving the bitmap file from the RIP and directing it to at least one output device, such as an imagesetter, platesetter, or large-format proofer. *Id.* at 5:61-67; 6:5-9; Fig. 2. Lucivero's system also contains a remote graphical user interface that allows a front end user to control print jobs over a "standard network environment." *Id.* at 5:41-60. The end user can select an off-line output device (also referred to as a "print engine"),

---

[3] "Postscript™," or PostScript™," refers to a page-description-language file format from Adobe Systems, Inc. Ex. 1106, 2:53-55.

Case IPR2013-00474
Patent 6,611,349

execute a "print" command, view the status of jobs, and "manipulate and control the timing and priorities of the output." *Id.* at 5:11-17, 50-54.

      2.    *Discussion*

"Anticipation requires the presence in a single prior art reference disclosure of each and every element of the claimed invention, arranged as in the claim." *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1458 (Fed. Cir. 1984). Based on the record before us, we are not persuaded that PIA is reasonably likely to prevail in showing that Lucivero anticipates claim 1. Although PIA summarizes Lucivero (Pet. 18-19), and cites broad passages of Lucivero as corresponding to claim 1's limitations (Pet. 20-21 (claim chart)), PIA does not explain how the cited portions correspond to the limitation for which they are cited. Nor is such correspondence self-evident. For example, claim 1 recites an "end user facility providing page building operations," which includes "the design and construction of pages from images, text, and data *available via said communication network.*" Ex. 1101, 21:23-27 (emphasis added). None of the Lucivero passages on which PIA relies seems to address this limitation.

Even if all of the claim 1 limitations were taught in the cited passages of Lucivero, it is unlikely that they would be "arranged as in the claim," i.e., as part of the same "printing and publishing system" as claim 1 recites. In *Net MoneyIN, Inc. v. Verisign, Inc.,* 545 F.3d 1359 (Fed. Cir. 2008), the Federal Circuit determined that the district court erred in concluding that a reference anticipates a claim because the district court combined parts of two separate examples described in the reference to find all of the elements of the claim. *Id.* at 1370-71. The court reasoned that a prior art reference that "includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention" is insufficient to show prior invention. *Id.* This principle applies here, because PIA

11

Case IPR2013-00474
Patent 6,611,349

relies on at least two distinct embodiments in Lucivero to show anticipation of
claim 1. PIA's anticipation analysis relies on a description of an embodiment that
Lucivero describes as prior art (Pet. 20 (citing, e.g., Lucivero, 7:54-8-2 and
Fig. 1)), and also on a description of an embodiment that Lucivero describes as
"one embodiment of the present invention" (Pet. 20-21 (citing, e.g., 8:23-39, 41-
67)). The anticipation analysis is, therefore, unpersuasive. Accordingly, we are
not persuaded that PIA is reasonably likely to prevail on this ground of
unpatentability.

### C.   Claim 1 – Obviousness – Nusbickel and Lucivero

PIA contends that the combination of Nusbickel and Lucivero renders
obvious claim 1. Pet. 21-23.

#### 1.   Nusbickel

Nusbickel relates to online directory services – e.g., online equivalents to
traditional phone books – in which information is provided over the Internet in
response to a user request; the information is displayed by filling in fixed data
fields in a presentation screen. Ex. 1103, 1:33-40; Figs. 1, 2. Figure 1 of
Nusbickel depicts a functional block diagram of such a system. Web server 101
runs a web server application 103, which is coupled to database server 105. *Id.* at
3:50-53. Web server 101 is also connected to the Internet 107. *Id.* at 3:56-59. End
user "data processing unit" 109, with web browser 111, is also connected to the
Internet. *Id.* An end user queries database server 105 via Web browser 111,
Internet 107, Webserver 101 and application 103. *Id.* at 4:10-14. The results of
the query are returned to the end user in the same manner. *Id.* at 4:14-16. The
invention in Nusbickel relates to a method of naming data files to simplify the
retrieval of certain data. *Id.* at 4:66-5:16; Fig. 4.

Case IPR2013-00474
Patent 6,611,349

### 2.    *Discussion*

As with the previous alleged ground of unpatentability, PIA merely summarizes the references and cites broad passages of them as corresponding to claim 1's limitations, but does not explain how the cited portions correspond to the limitation for which they are cited.  Nor is such correspondence self-evident.  For example, it does not appear to us that either Nusbickel or Lucivero, individually or in combination, discloses the limitation requiring that the end user facility provide page building operations that include "the design and construction of pages from images, text, and data available via said communication network."  Ex. 1101, 21:23-27.  We discussed Lucivero's failure to disclose this limitation in sec. II.B.2. above.  PIA also cites to Nusbickel 3:50-60, 4:16-46, and Figures 1 and 2, to disclose this limitation.[4]  Nusbickel describes a data processing system for hosting Web pages, and a Yellow Pages directory listing service in which a user selects search criteria and retrieves search results that are displayed on a predefined screen layout.  This disclosure does not, on its face at least, relate to the claim or limitation at issue.  Therefore, we are not persuaded that PIA is reasonably likely to show that claim 1 is obvious over Lucivero and Nusbickel.

### D.    *Claim 1 – Obviousness – Nusbickel, Sands, and Benson*

PIA contends that the combination of Nusbickel, Sands, and Benson renders obvious claim 1.  Pet. 24-27.

---

[4] It is unclear whether PIA, by citing to two references to disclose the same limitation, contends that each reference fully discloses the limitation, or whether PIA relies instead on some combination of the two references to disclose the limitation.

Case IPR2013-00474
Patent 6,611,349

### 1.   Sands

Sands discloses a digital page imaging (DPI) system that automates the imposition process. A customer creates a digital document for printing, converts the document to a "page description language" format file (e.g., PostScript or PDF), and sends it via a communication network to the printer. Ex. 1107, 3:21-27. At the printer, the system assigns each page of the customer product into its exact position and orientation in a film flat. *Id.* at 3:64-67. The flat is then output to a film image setter for creating a printing plate. *Id.* at 3:10-14.

### 2.   Benson

Benson relates to a "[d]istributed imaging and control architecture for digital printing presses and platesetters." Ex. 1108, cover page. The architecture comprises a job-control computer for selecting print jobs, and a separate image-control computer or computers for operating the various imaging devices. *Id.*

### 3.   Discussion

As above, we are not persuaded that any of Nusbickel, Sands or Benson, individually or in combination, discloses the limitation requiring that the end user facility provide page building operations that include "the design and construction of pages from images, text, and data available via said communication network." Ex. 1101, 21:23-27. PIA cites to portions of all three references as disclosing this limitation. Pet. 27 (claim chart). For the reasons discussed above, we are not persuaded that the cited portions of Nusbickel disclose the limitation. PIA also cites to Sands, Ex. 1107, 3:19-42. Pet. 27 (claim chart). However, this provision of Sands instead discusses a DPI system that receives pages electronically in "page description language" format from multiple publishing systems and imposes them into plate-ready film flats. Ex. 1107, 3:19-42. Further, the portion of Benson on which PIA relies, 7:52-58, is not in the record. The only portions of Benson in the

record are its cover page and a related search report. *See generally* Ex. 1108.
Therefore, we are not persuaded that PIA is reasonably likely to show that claim 1
is obvious over Nusbickel, Sands, and Benson.

    E.    *Claim 2 – Obviousness – Seybold Vol. 27 and Adams II*

    PIA contends that Seybold Vol. 27 and Adams II render obvious claim 2.
Claim 2 contains the same end-user-facility as claim 1, i.e., an end user facility that
provides page-building operations "including the design and construction of pages
from images, text, and data available via said communication network." Ex. 1101,
21:52-54. PIA relies on the same portions of Nusbickel and Lucivero to disclose
this limitation as it did for claim 1. Pet. 30 (claim chart). For the reasons
discussed above, however, we are not persuaded that Nusbickel and Lucivero,
individually or combined, disclose this limitation. Therefore, we are not persuaded
that PIA is reasonably likely to prevail on this ground of unpatentability.

    F.    *Claim 3 – Obviousness – Lucivero, Nusbickel, and Sands*

    PIA contends that Lucivero, Nusbickel, and Sands render obvious claim 3.
Claim 3 contains the same end-user-facility limitation as claim 1, i.e., an end user
facility that provides page-building operations "including the design and
construction of pages from images, text, and data available via said communication
network." Ex. 1101, 22:9-11. PIA relies on the same portions of Nusbickel and
Lucivero to disclose this limitation as it did for claim 1. Pet. 35 (claim chart). For
the reasons discussed above, we are not persuaded that Nusbickel and Lucivero,
individually or combined, disclose this limitation. Therefore, we are not persuaded
that PIA is reasonably likely to prevail on this ground of unpatentability.

    G.    *Claim 4 – Obviousness – Lucivero, Sands, Aldus, Andersson, Seybold*
            *Vol. 26, and Adams II*

Case IPR2013-00474
Patent 6,611,349

PIA contends that the combination of Lucivero, Sands, Aldus, Andersson, Seybold Vol. 26, and Adams II render obvious claim 4.  Claim 4 is drawn to a method of generating a plate-ready file configured for the creation of a printing plate, the plate-ready file being associated with "page layouts." Ex. 1101, 22:31-48.  Claim 4 requires, *inter alia,* the step of "remotely providing access to imaging files for searching and retrieving images used in the design of a page layout by a remote user." Ex. 1101, 22:36-38.  PIA cites the following as allegedly disclosing this limitation: Lucivero, 6:63-67 and 9:1-4; Sands, 8:45-56; Aldus at 5, col. 1; and Seybold Vol. 26 at 21, ¶¶ 3, 4, and 7.  PIA does not explain how the cited portions of these references correspond to the limitation in question.  Nor do we discern any correspondence.  The cited portions of Lucivero state:

> It is another object of the present invention to provide an electronic prepress system capable of reducing the time for the front-end to become free to send another job by allowing more jobs to be queued up to the RIP from the front-end. . . . It will be appreciated from FIGS. 2 and 3 that each RIP 34 on the network 35 can be accessed by any front-end 40 or by the server 42 or other computer system 45, any of which may be either local or remote.

Ex. 1106, 6:64-9:4.  Petitioner does not explain the connection between these passages and the limitation at issue; nor is such connection evident.  The cited portions of Sands, Aldus, and Seybold Vol. 26 likewise appear unrelated to this limitation.  Therefore, we are not persuaded that PIA is reasonably likely to prevail on this ground of unpatentability.

H.    *Claim 10 – Obviousness – Lucivero, Sands, Zilles, and Andersson*

PIA contends that Lucivero, Sands, Zilles, and Anderson render obvious claim 10.  Claim 10 requires, *inter alia,* "storing high resolution files on a computer server" and "generating low resolution files corresponding to said high

Case IPR2013-00474
Patent 6,611,349

resolution files." For the storing step, PIA relies on Lucivero, 21:53-63; Sands,
5:16-22; and Zilles at 313. Pet. 45 (claim chart). For the generating step, PIA
relies on Sands, 5:16-22 and Andersson at 20. Even assuming that the storing step
is disclosed in one or more of the prior art references cited by PIA, we are not
persuaded that the cited passage of either Sands or Anderson discloses the
generating step. The passage of Sands on which PIA relies discusses the operation
of a typesetter that produces press film flats for plate making and printing. Ex.
1107, 5:16-22. The passage of Andersson on which PIA relies discusses the
advantages of portable documents, as well as the characteristics of Acrobat
Distiller, Acrobat Reader, and Acrobat Exchange. Ex. 1112 at 20.[5] Neither
passage discusses the generation of low resolution files from high resolution files
stored on a computer server. Therefore, we are not persuaded that PIA is
reasonably likely to prevail on this ground of patentability.

I.     *The Remaining Grounds of Unpatentability*

PIA's remaining grounds of unpatentability address claims that depend,
either directly or indirectly, from one of claims 4 and 10. Pet. 46-60. Because we
are not persuaded that PIA is reasonably likely to prevail on any of its asserted
grounds of unpatentability of claims 4 and 10, we are also not persuaded that PIA
is reasonably likely to prevail on any of its asserted grounds of unpatentability of
the dependent claims.

### III.   CONCLUSION

We decline to institute an *inter partes* review of any of the challenged

---

[5] Also, notably, PIA does not argue expressly that a person of ordinary skill
in the art would have had a reason to combine Andersson with the other references
on which PIA relies. Pet. 45.

17

Case IPR2013-00474
Patent 6,611,349

claims.

## IV.   ORDER

For the reasons given, it is

ORDERED that the Petition is denied as to all of the challenged
claims of the '349 patent.


PETITIONER:
John M. Adams, Esq.
Lawrence G. Zurawsky, Esq.
Price & Adams, P.C.
4135 Brownsville Road,
P.O. Box 98127
Pittsburgh, PA  15227
paip.law@verizon.net


PATENT OWNER:
W. Edward Ramage, Esq.
Samuel F. Miller, Esq.
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
Baker Donelson Center
211 Commerce St., Ste 800
Nashville, TN  37201
eramage@bakerdonelson.com

# EXHIBIT 2

Trials@uspto.gov                                                    Paper 9
Tel: 571-272-7822                                    Entered: November 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

EASTMAN KODAK CO., AGFA CORP., ESKO SOFTWARE BVBA, and
HEIDELBERG, USA,
Petitioner,

v.

CTP INNOVATIONS, LLC,
Patent Owner.

———————————

Case IPR2014-00791
Patent 6,611,349 B1

———————————

Before HOWARD B. BLANKENSHIP, BENJAMIN D. M. WOOD, and
BRIAN J. MCNAMARA, *Administrative Patent Judges.*

WOOD, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2014-00791
Patent 6,611,349 B1

# I.   INTRODUCTION

## A.   Background

Eastman Kodak Co., Agfa Corp., Esko Software BVBA, and
Heidelberg, USA (collectively, "Petitioner") filed a Corrected Petition
(Paper 4, "Pet.") to institute an *inter partes* review of claims 4–14 (the
"challenged claims") of U.S. Patent No. 6,611,349 B1 (Ex. 1001, "the '349
patent"). CTP Innovations, LLC ("Patent Owner") filed a Preliminary
Response (Paper 8, "Prelim. Resp."). We have jurisdiction under 35 U.S.C.
§ 314.

Institution of an *inter partes* review is authorized by statute when "the
information presented in the petition filed under section 311 and any
response filed under section 313 shows that there is a reasonable likelihood
that the petitioner would prevail with respect to at least 1 of the claims
challenged in the petition." 35 U.S.C. § 314(a). We determine that
Petitioner has shown a reasonable likelihood that it would prevail with
respect to at least one of the claims of the '349 patent. Accordingly, we
grant the Petition for *inter partes* review of the '349 patent.

## B.   Related Proceedings

Petitioner discloses that the '349 patent has been asserted in 49
infringement actions, most of which are still pending. Pet. 1; Ex. 1002.
Petitioner also has filed three additional petitions for *inter partes* review:
IPR2014-00790, for review of claims 1–3 of the '349 patent; IPR2014-
00788, for review of claims 10–20 of U.S. Patent 6,738,155 ("the '155
patent"), which shares the '349 patent's disclosure; and IPR2014-00789, for
review of claims 1–9 of the '155 patent. Pet. 2. The '349 and '155 patents

2

IPR2014-00791
Patent 6,611,349 B1

were also the subject of two previous petitions for *inter partes* review, both of which were denied. *See Printing Indus. of Am. v. CTP Innovations, LLC,* Case IPR2013-00474 (PTAB Dec. 31, 2013) (Paper 16) (denying petition for *inter partes* review of the '349 patent); *Printing Indus. of Am. v. CTP Innovations, LLC,* Case IPR2013-00489 (PTAB Dec. 30, 2013) (Paper 15) (denying petition for *inter partes* review of the '155 patent).

### C.   The '349 Patent

The '349 patent issued on August 26, 2003, from an application filed July 30, 1999. Ex. 1001, cover page. The '349 patent relates to "a system and method of providing publishing and printing services via a communications network." *Id.* at 1:9–10. According to the '349 patent, "[k]ey steps for producing printed materials using a plate process include (1) preparing copy elements for reproduction, (2) prepress production, (3) platemaking, (4) printing, and (5) binding, finishing and distribution." *Id.* at 1:12–15. In the first or "design" stage, an end user—e.g., a publisher, direct marketer, advertising agency, or corporate communication department—uses a desktop publishing program such as "QuarkXpress" to design "pages" from image and data files. *Id.* at 1:16–25. In the prepress production stage, the user-created pages (also called "copy") are "transformed into a medium that is reproducible for printing." *Id.* at 1:26–28. This transformation typically involves typesetting, image capture and color correction, file conversion, "RIPing, trapping, proofing, imposition, filmsetting, and platesetting." *Id.* at 1:29–32.

"RIPing" is based on the acronym "RIP," which stands for raster image processor. *Id.* at 7:57–59. A RIP is a hardware or software component that "rasterize[s]" an image file—i.e., converts it to a "bitmap"

3

IPR2014-00791
Patent 6,611,349 B1

or raster image. *Id*. "RIPing" is therefore synonymous with rasterizing. A bitmap "is a digitized collection of binary pixel information that gives an output device, such [as a printer, proofer, or platesetter,] the ability to image data to paper, film, or plate." *Id*. at 7:59–62. "Proofing" involves creating a sample of the finished product that is sent to the end user for approval. *Id*. at 1:32–35. After alterations are made, new proofs are sent to the end user; once the end user approves the proof, a medium, such as a computer-to-plate (CTP) file, is produced and sent to the printer. *Id*. at 1:35–39. "Imposition" involves "the set of pages on a particular plate as well as their positioning and orientation." *Id*. at 1:38–40. According to the '349 patent, imposition "is particularly important in the creation of booklets or catalogs, where pages are positioned using register marks to assist in the stripping, collating, and folding of the printed product." *Id*. at 1:41–44. A printer makes a plate "using the medium created during prepress," e.g., if a CTP file is used, the printer converts the CTP file into a printing plate. *Id*. at 1:45–48. The printer uses the plate on a printing press to reproduce the product; the product is bound, finished, and distributed to create the product in its final form. *Id*. at 1:45–51.

The '349 patent describes and claims a publishing and printing system in which "[s]ystem components are installed at an end user facility, a printing company facility, and a central service facility," each connected to the others via a communication network. *Id*. at 2:31–36, 51–56. Figure 1, reproduced below, depicts an embodiment of the claimed invention:

IPR2014-00791
Patent 6,611,349 B1



FIG. 1

Figure 1 depicts end user facility 300, printing company facility 400, and central service facility 105 connected together via either private network 160 or public network 190. *Id.* at Fig. 1.  In this embodiment, end user facility 300 comprises a router, desktop computer for page-building operations, and a color proofer and black and white printer for high-resolution proofing. *Id.* at 7:38–40, Figs. 1, 2, 5.  Printing company facility 400 comprises a router, a hub, a server, a laser printer, a color plotter, and a platesetter, and performs production management, digital plate-making, desktop imposition, and press services. *Id.* at 8:31–33, 9:38–43, Figs. 1, 4, 5.  Central service facility 105 comprises server 110, "hierarchical storage management" (HSM) system 120, a "digital content management" system 130, local area network (LAN) 150 and communication routing device 200. *Id.* at 5:34–50. "Data may be exchanged between central service facility 105 and either private network 160 or public network 190 in any suitable format, such as in accordance with the Internet Protocol (IP),

IPR2014-00791
Patent 6,611,349 B1

the Transmission Control Protocol (TCP), or other known protocols." *Id.* at 5:21–25. An end user can store files in HSM system 120 to reduce storage needs at the end user facility. *Id.* at 7:19–23, 38–40.

Server 110 uses software capable of performing "open prepress interface" (OPI) operations. *Id.* at 5:62–64. OPI operations include "high resolution image swapping." *Id.* at 10:31–33. That is, OPI permits a lower resolution image file to be used as a proxy for a higher resolution file during page-building operations, which is advantageous because the low resolution image can be transmitted and manipulated more quickly. *Id.* at 7:46–49, 10:44–49. The low resolution images are replaced by the corresponding high resolution images before final proofing and printing. *Id.* at 7:49–51.

In operation, end user facility 300 designs a page to be printed by, e.g., editing or placing low-resolution images downloaded via private network 160 or public network 190 from HSM system 120 at central service facility 105. *Id.* at 7:36–43, 13:11–13, Fig. 9. The page layout application—e.g., QuarkXpress—establishes links from the low resolution images to the corresponding high resolution files stored on HSM system 120. *Id.* at 7:43–45, 13:13–15, Fig. 9. When the page-building process is completed, end user facility 300 prints the page, with OPI comments imbedded, to a "thin Postscript file" at central service facility 105. *Id.* at 13:15–20. "The Postscript file is called 'thin' because it contains low resolution images." *Id.* at 13:20–21. At central service facility 105, the thin Postscript file is dropped into a "hot" folder on server 110, which "parses the thin Postscript file, pulls out the OPI data, and replaces it with high resolution data," thereby creating a "fat Postscript file." *Id.* at 13:21–26.

IPR2014-00791
Patent 6,611,349 B1

### D.   Illustrative Claims

Claims 4 and 10 are independent and are drawn to methods of generating a plate-ready file configured for the creation of a printing plate. Ex. 1001, 22:31–48; 23:3–17.   Claims 4 and 10 are reproduced below:

> 4.   A method of generating a plate-ready file configured for the creation of a printing plate, said plate-ready file being associated with page layouts and being provided in real time from a remote location using a communication network, the method comprising:
>
> remotely providing access to imaging files for searching and retrieving images used in the design of a page layout by a remote user;
>
> establishing links to said imaging files, thereby creating a thin Postscript file from the page layout designed by the remote user;
>
> parsing said thin Postscript file to extract data associated with low resolution images and replace with high resolution data, thereby forming a fat Postscript file;
>
> creating a portable document format (PDF) file from said fat Postscript file; and
>
> converting said PDF file to a file in plate-ready format.
>
> 10.   A method of generating a plate-ready file configured for the creation of a printing plate, said plate-ready file being associated with page layouts and being provided in real time from a remote location using a communication network, the method comprising:
>
> storing high resolution files on a computer server;
>
> generating low resolution files corresponding to said high resolution files;
>
> providing said low resolution files to a remote client for the designing of a page layout via a communication network;
>
> generating a plate-ready file from the page layout designed by said remote client; and
>
> providing said plate-ready file to a remote printer.

IPR2014-00791
Patent 6,611,349 B1

### E.  Prior Art Relied Upon

Petitioner relies upon the following prior-art references:

| | | | |
|---|---|---|---|
| Jebens | US 6,321,231 | Nov. 20, 2001 | Ex. 1006 |
| Dorfman | WO 98/08176 | Feb. 26, 1998 | Ex. 1007 |

Agfa Apogee, The PDF-based Production System (1998) ("Apogee") (Ex. 1008);

Apple OPI White Paper (1995) ("OPI White Paper") (Ex. 1009);

Mattias Andersson et al., PDF PRINTING AND PUBLISHING, THE NEXT REVOLUTION AFTER GUTENBERG (Micro Publishing Press 1997) ("Andersson") (Ex. 1010);

Richard M. Adams II et al., COMPUTER-TO-PLATE: AUTOMATING THE PRINTING INDUSTRY (Graphic Arts Technical Foundation 1996) (Ex. 1011) ("Adams II").

### F.  Asserted Grounds of Unpatentability

Petitioner contends that the challenged claims are unpatentable under 35 U.S.C. § 103 based on the following specific grounds (Pet. 6–7):

| Reference[s] | Basis | Claims Challenged |
|---|---|---|
| Jebens, Apogee, and OPI White Paper | § 103 | 4–9 |
| Jebens and Apogee | § 103 | 10–14 |
| Dorfman, Apogee, and OPI White Paper | § 103 | 4–8 and 10–14 |
| Dorfman, Apogee, OPI White Paper, and Adams II | § 103 | 9 |

IPR2014-00791
Patent 6,611,349 B1

## II.   ANALYSIS

### A.   *Preliminary Issues*

#### 1.   *The Prior Petition*

Patent Owner argues that we should not consider this Petition because we already considered, and denied, a petition for *inter partes* review of the '349 patent: *Printing Indus. of Am. v. CTP Innovations, LLC*, Case IPR2013-00474 (PTAB) ("the '474 IPR"). Prelim. Resp. 13–15 (citing Ex. 1004). Patent Owner contends that the present Petition represents a "second bite at the apple," or a "do over," of the '474 IPR, because it relies on "the same or equivalent" prior art as the '474 IPR. *Id.* First, Patent Owner notes that two of the prior-art references asserted here, Dorfman and Adams II, were also asserted in the '474 IPR. *Id.* at 14. Second, Patent Owner alleges that Apogee is equivalent to "Lucivero," a reference asserted in the '474 IPR. *Id.* Finally, Patent Owner alleges that OPI White Paper is equivalent to "Sands," another reference asserted in the '474 IPR. *Id.*

Patent Owner overstates the overlap between this proceeding and the '474 IPR. First, Patent Owner does not adequately support its contention that Apogee and OPI White Paper are equivalent to Lucivero and Sands, respectively; nor is such equivalence self-evident. The fact that Apogee discusses products sold by the same entity that owns Lucivero falls far short of establishing that Apogee and Lucivero are equivalent. Patent Owner provides no support for the alleged equivalence between OPI White Paper and Sands.

Second, the fact that Dorfman and Adams II are cited in both proceedings does not establish that we are duplicating our efforts in considering the Petition. [Unlike here, the petitioner in the '474 IPR did not

IPR2014-00791
Patent 6,611,349 B1

rely on either Dorfman or Andersson in arguing that claims 1–3—the claims at issue in this proceeding—are unpatentable. Ex. 1004, 7–8.]

## 2. *Real-Parties-In-Interest*

Patent Owner contends that Petitioner failed to comply with 37 C.F.R. § 42.8(b)(1) because it failed to identify all real-parties-in-interest. Prelim. Resp. 26–30. According to Patent Owner, all of Petitioner's customers are real-parties-in-interest because Petitioner admitted that it filed the Petition on their behalf. *Id.* at 28. Patent Owner relies on a press release in which Petitioner states that "[w]e feel it is important to take this action [file petitions for *inter partes* review of the '349 patent] to support our customers from these frivolous claims [of infringement]." Ex. 2001, 1. Patent Owner argues that "the Board should require Petitioner[] to amend the Petition to list all customers [as real-parties-in-interest] or, in the alternative, should dismiss the Petition in its entirety." Prelim. Resp. 29–30.

On this record, we are not persuaded that any of Petitioner's customers is a real-party-in-interest in this proceeding. A determination whether a non-party to an *inter partes* review is a real-party-in-interest is a "highly fact-dependent question," based on whether the non-party "exercised or could have exercised control over a party's participation in a proceeding." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759–60 (Aug. 14, 2012). Petitioner's filing of the present petition "to support [its] customers" does not, by itself, mean that its customers exercise control over Petitioner's actions in this proceeding.

Patent Owner also seems to argue that Petitioner filed the Petition on behalf of all of the over 10,000 members of the Printing Industries of America ("PIA"), the petitioner in the '474 IPR. For example, Patent Owner

IPR2014-00791
Patent 6,611,349 B1

notes that Thomas Topp, a senior vice president of Heidelberg, USA, one of the Petitioner entities, is a member of the board of directors of PIA. Prelim. Resp. 28–29. Patent Owner also notes that Petitioner entities Heidelberg, Agfa, and Eastman Kodak are substantial donors to PIA. *Id.* at 29. But, again, Petitioner's financial and other support of PIA does not, by itself, mean that either PIA or its members controls Petitioner's actions in this proceeding. Therefore, on the current record, we are not persuaded that Petitioner failed to identify any real-parties-in-interest.

### B.   *Claim Construction*

The Board gives claim terms in unexpired patents their broadest reasonable construction in light of the specification in which the terms appear. 37 C.F.R. § 100(b). Claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Petitioner proposes constructions for the following terms: "plate-ready file . . . being provided in real time . . .," "plate-ready file," "thin PostScript file," and "fat PostScript file." Pet. 20–22. Patent Owner proposes alternative constructions for these terms, as well as a construction for "communication network." Prelim. Resp. 7–12. For purposes of this Decision, we need only address "real time," and, in particular, whether this phrase limits the scope of the claims, and construe "thin Postscript file" and "fat Postscript file."

11

IPR2014-00791
Patent 6,611,349 B1

     *1.*    *"real time"*

The term "real time" appears in the preamble of each of independent claims 4 and 10, as follows: "[a] method of generating a plate-ready file configured for the creation of a printing plate, said plate-ready file being associated with page layouts and being provided in real time from a remote location using a communication network." Ex. 1001, 22:31–35, 23:3–6. Petitioner contends that under the broadest reasonable interpretation, providing a plate-ready file "in <u>real time</u> from a remote location using a communication network" should be interpreted "as encompassing the electronic transmission of data, images, files etc. over a communication network." Pet. 20. According to Petitioner, this interpretation is consistent with Patent Owner's position taken in a civil action asserting infringement of the '349 patent, in which Patent Owner distinguished the provision of services to a remote client "in <u>real time</u> from a remote location using a communication network," from using mail or express carrier to send disks containing pages to be printed or proofed. *Id.* (citing Ex. 1012 ¶¶ 11, 12).

Patent Owner disagrees with Petitioner's interpretation, arguing that it "ignores the term 'real time,' or equates it to simply mean any electronic transmission over a communication network." Prelim. Resp. 7. According to Patent Owner, the Specification makes clear that providing services in "real time" requires more than transmission over a communication network, because it notes that a prior art system, "WAM!NET," transmits data over a communication network, and yet, according to the Specification, "document delivery by WAM!NET is not done in real time." *Id.* at 7–8 (citing Ex. 1001, 6:55–65). Patent Owner proposes interpreting "real time" to mean

12

IPR2014-00791
Patent 6,611,349 B1

"the immediate processing of input," based on dictionary definitions. *Id.* at 8–9 (citing Ex. 2010, 2011).

As noted above, the term "real time" appears in the preamble of each of the claims at issue. Our reviewing court has stated that "[g]enerally . . . the preamble does not limit the claims." *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (internal citation omitted). While "the preamble may be construed as limiting if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim," it is not separately limiting "when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Id.* at 1358–59 (internal citations and quotations omitted). Here, the preamble does not recite any essential steps, affect the steps in the body of the claim, or provide a necessary antecedent for any terms in the steps. Thus, it would appear that "the claim drafters did not rely on the preamble language to define or refine the scope of the asserted claims." *Id.* at 1359 (citation omitted).[1] Thus, we determine, for purposes of this decision and on the present record, that the preambles in the claims at issue, including the term "real time," do not limit the scope of the claims.

---

[1] To the extent that providing a plate-ready file "in real time from a remote location using a communication network" does limit the scope of the claims, it would only require that the plate-ready file be provided remotely using a communication network. Providing a plate-ready file "in real time from a remote location" is best read to refer to the *end result* of using a telecommunication network, rather than an additional limitation beyond using a telecommunication network. By analogy, in a preamble reading "providing hot food using a microwave oven," providing hot food is the end result of using a microwave oven, and does not, by itself, require more than using a microwave oven.

IPR2014-00791
Patent 6,611,349 B1

The discussion of WAM!NET in the Specification does not persuade us otherwise. That discussion does not provide sufficient information about WAM!NET for us to make any useful inferences regarding the meaning of "real time." For example, the Specification does not explain the specific "documents" that "WAM!NET is delivering, from whom and to whom these documents are being delivered, the specific method of "delivery," and why that method of delivery is not done in "real time."

### 2. *"thin Postscript file"*

Petitioner contends that thin Postscript file should be construed as "a digital file in PostScript format, designed with low-resolution images." Pet. 22 (citing Ex. 1022 ¶ 81). Petitioner argues that this construction is consistent with that adopted in the '474 IPR decision, which is "a 'digital file containing low resolution images, graphics, texts, and art." *Id.* at 22–23 (quoting Ex. 1004, 9–10). Patent Owner asserts that the construction adopted in the '474 IPR "is acceptable for purposes of the decision on this Petition." Prelim. Resp. 11–12.

For purposes of this decision, and on the present record, we construe "thin Postscript file" as "a Postscript file containing low resolution images." This construction is consistent with the discussion of thin Postscript files in the Specification, which defines a thin Postscript file as one "contain[ing] low resolution images." Ex. 1001, 13:18–33.

### 3. *"fat Postscript file"*

Petitioner proposes construing fat Postscript file as "a digital file in Postscript format that includes high-resolution images." Pet. 23. Petitioner contends that this construction is consistent with that adopted in the '474 IPR Decision, which was "a 'digital file containing high resolution images,

IPR2014-00791
Patent 6,611,349 B1

graphics, texts, and art.'" *Id.* (quoting Ex. 1004, 10). Patent Owner asserts
that the construction adopted in the '474 IPR "is acceptable for purposes of
the decision on this Petition." Prelim. Resp. 12.

For purposes of this decision, and on the present record, we construe
"fat Postscript file" as "a Postscript file containing high resolution images."
This construction is consistent with the definition set forth in the
Specification. Ex. 1001, 13:27–32.

C.    *Claims 4–9 — Jebens, Apogee, and OPI White Paper*

Independent claim 4 is drawn to a method of generating a plate-ready
file associated with page layouts. Claims 5–9 ultimately depend from claim
4. Petitioner contends that claims 4–9 are unpatentable under 35 U.S.C.
§ 103(a) as obvious over Jebens, Apogee, and OPI White Paper.

1.    *Jebens*

Jebens describes "a digital image management and order delivery
system." Ex. 1006, 2:13–14. The system provides a centralized, searchable
database of digital images that can be used and modified by authorized
users. *Id.* at 4:54–56. The system also serves as a job order developer and
conduit for routing files from a client, such as an advertising agency, to a
printer. *Id.* at 4:60–62. Figure 1, reproduced below, illustrates Jebens's
invention.

15

IPR2014-00791
Patent 6,611,349 B1

**FIG. 1**



Figure 1 depicts an embodiment of Jebens's data management and work-order delivery system. *Id*. at 4:20–23. The system comprises host system 10 in communication with a variety of users, such as browsers and client orderers 12, image providers 14, and suppliers 16. *Id*. at 6:52–65. The host system software includes, *inter alia*, an image database that archives low and high resolution copies of digital image files. *Id*. at 8:9–13. The system is "ideally suited for facilitating publication and the like." *Id*. at 4:66–67. Image providers 14 may include a corporation that stores digital images of its products on host system 10 to more efficiently use its in-house computer storage facilities. *Id*. at 4:67–5:5, 6:55–60. Browsers and client orderers 12 may include an advertising agency that the corporation hires to create a brochure using the stored images; and suppliers 16 may include the printer that will print the finished brochure. *Id*. at 5:5–10, 6:54–65. To use the system, the corporation gives the agency information to access the host system; the agency then searches the host system and downloads low-

16

IPR2014-00791
Patent 6,611,349 B1

resolution copies of desired images, creates the brochure using the low-resolution copies, and sends the brochure back to the host system. *Id.* at 5:11–20. The host system replaces the low-resolution copies with high-resolution copies of the images, and electronically routes the brochure with the high-resolution images to a printer per the agency's instructions. *Id.* at 5:19–20. Communication between host system 10 and users 12, 14, and 16 "can be effected by any known means of connectivity," such as "through local area networks or wide area networks," or "hardwired to one another as an intranet." *Id.* at 6:66–7:4–20.

### 2. *Apogee*

Apogee describes the Agfa Apogee print-production system. Ex. 1008, 1. Content can be created in any format and output to Apogee in either PostScript or PDF format; Apogee normalizes incoming files to PDF "to guarantee complete predictability and compatibility." *Id.* at 3–4. The PDF files are stored as individual PDF pages and become "Digital Masters" to create all production versions of the document and to provide a version that can be proofed and edited remotely. *Id.* at 4, 6. For a specific print job, Apogee collects the appropriate pages, automatically imposes the pages into a "digital flat," and rasterizes it for the selected output device (e.g., an image setter or plate setter). *Id.* at 6. The result is a "Print Image File" (PIF) that "contains all the dots that will appear on the film or plate." *Id.*

### 3. *OPI White Paper*

OPI White Paper describes the OPI "image swapping" process. Ex. 1009, 10. According to OPI White Paper, "image swapping enables a page designer to work with a small screen-resolution picture file during page design and then rely on the intervention of the OPI server to swap it out for

IPR2014-00791
Patent 6,611,349 B1

the high-resolution, color-separated file necessary to render the picture in print." *Id.* at 10, 12, Fig. 2d.  Figure 2d depicts this process, which begins with a workstation designing a layout page using a preview image and then creating a PostScript file in which "OPI comments" replace the preview image. *Id.* at 12, Fig. 2d.  This file is sent to the OPI server, which uses the OPI comments to locate the high-resolution file that corresponds to the preview image, and then replaces the OPI comments with the high-resolution image. *Id.*  OPI White Paper also describes a particular implementation of the OPI process at a printing facility in Harrisonburg, Virginia. *Id.* at 31–32, Fig. 4c.

### 4.    *Analysis*

Claim 4 claims a method comprising the steps of, *inter alia*, (1) creating a thin Postscript file from the user-designed page layout; (2) converting the thin Postscript file to a fat Postscript file; and (3) converting the fat Postscript file to a PDF file.  Petitioner relies on OPI White Paper to teach creating the thin Postscript file and converting it to a fat Postscript file, and on Apogee to teach converting the fat Postscript file to a PDF file.  Pet. 34–35.  However, we are not persuaded that the combination of these references would teach or fairly suggest these steps.  OPI White Paper does not teach converting the fat Postscript file to PDF before sending the file to a printer or imagesetter. *See* Ex. 1009, 12, Fig. 2d.  Apogee teaches converting incoming files to PDF *before* "OPI image exchange." *See* Ex. 1008, 6–7 ("Apogee Pilot normalizes the incoming files into PDF, collects the pages, imposes, does OPI image exchange and sends this imposed 'digital flat' to an Apogee PDF RIP").  As discussed above, in the OPI process, pages are built using low resolution images, which are exchanged

IPR2014-00791
Patent 6,611,349 B1

with corresponding high resolution images before final proofing and printing.  Because Apogee converts to PDF before OPI image exchange, Apogee's system would, at best, create a PDF from a thin Postscript file and perform OPI image exchange on the resulting PDF file; no fat Postscript file would be created, and therefore there would be no fat Postscript file to convert to PDF.

Petitioner asserts that there are "numerous and varied" reasons to convert Postscript files to PDF, and that each of these benefits would have motivated a person of ordinary skill to convert the fat Postscript file, generated at Jebens's central system, into a PDF file.  Pet. 31.  However, it is counterintuitive for these benefits to have motivated a person of ordinary skill to *delay* the conversion until after OPI image exchange.  One would expect the skilled artisan to want to perform the conversion earlier in the process, as Apogee teaches, to obtain the benefits of using PDF files earlier. For these reasons, we are not persuaded that Petitioner is reasonably likely to show that claim 4, and claims 5–9 that depend from claim 4, would have been obvious over Jebens, Apogee, and OPI White Paper.

### D.   *Claims 10–14 — Jebens and Apogee*

Claim 10 is similar to claim 4, but does not require converting a fat Postscript file to a PDF file.  Nor do Claims 11–14, which ultimately depend from claim 10.  Petitioner asserts that these claims would have been obvious over Jebens and Apogee.  We have reviewed Petitioner's and Patent Owner's contentions and arguments regarding this proposed ground of unpatentability, and are persuaded, on the current record, that Petitioner has adequately identified in these references the limitations recited in claims 10–14, as well as reasons to combine the references.  For example, with respect

IPR2014-00791
Patent 6,611,349 B1

to claim 10, Petitioner asserts that Jebens's host system 10 stores high- and low-resolution versions of images in a searchable format; permits a remote first user to locate and download low-resolution copies of images for the design of a page layout; receives from the first user an electronic file defining a document that incorporates at least one of the downloaded images; and routes the file—with high-resolution versions of the images replacing the low-resolution versions—to a remote second user, which may be a printer. Pet. 39–41. Petitioner relies on Apogee to teach generating a plate-ready file from the page layout, and asserts that one of ordinary skill in the art would have been motivated to incorporate the teachings of Apogee into the Jebens printing system "to allow for a printing facility to produce a printing plate for offset printing." Pet. 27.

Patent Owner disputes that Jebens and Apogee render claims 10–14 obvious. Prelim. Resp. 20–21. First, Patent Owner argues that Jebens "does not disclose a real time system as described in the '349 Patent, because the '349 Patent specification discloses another prior art system with more network connectivity than Jebens, yet states that this more-connected system is *not real time*." *Id*. at 16. The prior art system to which Patent Owner refers is the WAM!NET private communication network discussed above in the context of discussing the "real time" claim term. This argument is based on Patent Owner's position that the term "real time" independently limits the scope of the claims. As discussed above, we disagree with that position. Accordingly, this argument is not persuasive.

Second, Patent Owner argues that Jebens does not disclose generating a plate-ready file, and providing the plate-ready file to a remote printer. Prelim. Resp. 20. Patent Owner also contends that Apogee does not cure

IPR2014-00791
Patent 6,611,349 B1

these defects. *Id.* at 21. We do not find this argument persuasive. Petitioner does not rely on Jebens or Apogee alone to teach these limitations, but rather on their combination. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness cannot be established by attacking the references individually when the rejection is predicated upon a combination of prior art disclosures).

> E.   *Claims 4–8 and 10–14 — Dorfman, Apogee, and OPI White Paper*

Petitioner asserts that claims 4–8 and 10–14 would have been obvious over Dorfman, Apogee, and OPI White Paper.

> 1.   *Dorfman*

Dorfman describes a "technique for easily creating and proofing customized printed material before printing on a production printing system." Ex. 1007, 1 (abstract). A user can access a template in PDF format from the system's website and modify the template by adding low-resolution copies of selected images and other variable data, thereby creating a dynamic PDF file representing the material to be printed. *Id.* at 4:3–8, 8:1–4.[2] The PDF file may be viewed or printed to a local low-resolution printer for final proofing. *Id.* at 8:4–11. The user can make any necessary changes or corrections to the PDF file from the system website and send the file "for printing using conventional printing technology where the low resolution images would be replaced by the high resolution images by an OPI . . . process before printing." *Id.* at 4:18–21, 8:23–26.

Figure 1, reproduced below, depicts an embodiment of this system:

---

[2] We conform to Petitioner's usage of Dorfman's original page numbers rather that Petitioner's supplemental page numbers.

IPR2014-00791
Patent 6,611,349 B1



Figure 1 depicts Dorfman's system comprising front end 2, memory 4, PDF builder 6, and production printing system 10. *Id*. at 5:25–6:7. Front end 2 may be the office of a graphic artist employed by an advertising agency, and typically includes a PC with internet connectivity and browser software. *Id*. at 5:29–6:10. Memory 4, PDF builder 6, and printing system 10 are remotely located from front end 2, e.g., at the facilities of a commercial printing service. *Id*. at 6:4–7. Memory 4 may contain a reference library, low resolution and high resolution images, and other data. *Id*. at 5:27–29. Commercial printer 10 maintains a website that allows front end users access to templates and images stored in memory 4. *Id*. at 6:10–13.

   2.   *Analysis*

   We have reviewed Petitioner's and Patent Owner's contentions and arguments regarding the combination of Dorfman, Apogee, and OPI White Paper, and are persuaded, on the current record, that Petitioner has adequately identified in these references the limitations recited in claims 10–

14, as well as reasons to combine the references.  However, we are not persuaded that the references, individually or combined, teach or fairly suggest all of the limitations of claims 4–8.

a.   Claims 10–14

We have reviewed Petitioner's and Patent Owner's contentions and arguments regarding this proposed ground of unpatentability, and are persuaded, on the current record, that Petitioner has adequately identified in these references the limitations recited in claims 10–14, as well as reasons to combine the references.  For example, with respect to claim 10, Petitioner asserts that Dorfman's system comprises memory 4 that stores templates and images, and provides them to a remote end user.  The end user at front end 2 customizes the templates with low-resolution versions of the stored images and other variable data, and uses PDF builder 6 to create a dynamic PDF corresponding to the custom printed material.  Therefore, on the present record, we agree with Petitioner that Dorfman teaches the "storing," "generating," and "providing" steps of claim 10.  We also agree with Petitioner that Dorfman teaches providing files to a remote printer, which can use "conventional printing technology," but that Dorfman does not expressly teach providing a plate-ready file to the remote printer.  For this limitation, Petitioner relies on Apogee.  Petitioner argues that because Dorfman's system can make use of any conventional printing technology, a person of ordinary skill in the art would have understood that Dorfman's printing system can be used to coordinate the design and printing process for offset printing, which requires the generation of a plate-ready file representing the document to be printed.  Pet. 47.  Thus, Petitioner argues, "[o]ne of ordinary skill in the art would have been motivated to incorporate

IPR2014-00791
Patent 6,611,349 B1

the teachings of Apogee into the Dorfman printing system to accommodate offset printing." *Id*. at 48.  In light of the above, we determine that Petitioner has demonstrated that there is a reasonable likelihood that it would prevail in showing that the combination of Dorfman and Apogee renders claims 10–14 unpatentable under 35 U.S.C. § 103.

We have considered Patent Owner's arguments to the contrary and find them unpersuasive on the current record.  For example, Patent Owner argues that "the Dorfman system is not relevant to the '349 patent" because it "describes a variable data printing (VDP) system."  Prelim. Resp. at 22.  According to Patent Owner,

> VDP systems do not involve producing "plate-ready files," which is the *raison d'être* of the computer-to-plate (CTP) system in the '349 Patent.  As Petitioners admit, "Dorfman explains that page layout templates may be tailored to a specific user, e.g., a supermarket chain or a beer distributor, and that the user may input certain variable data . . . ."  Kodak reinforces this difference in its own on-line materials: "The NexPress front end supports complex variable data print (VDP) jobs.  The pages of a conventional print job are generally RIPped only once regardless of the number of copies.  In contrast, only a single copy of a VDP job is usually printed because the content on each page is unique."

*Id*. (citing Ex. 2009, 21).

We understand Patent Owner to be arguing that because offset printing typically would not be used for low-volume VDP jobs, which Patent Owner alleges Dorfman's system is limited to, neither a plate nor a plate-ready file would be needed to use Dorfman's system.  However, the record before us does not support Patent Owner's allegation that Dorfman describes only a low-volume VDP system that would not make use of offset printing, or that Dorfman's system is otherwise limited to low-volume jobs.  On the

IPR2014-00791
Patent 6,611,349 B1

contrary, Dorfman's system relates to "[c]ustomized printed materials,"
which Dorfman teaches may be printed "in large quantities." Ex. 1007,
2:13–16. The Kodak reference to which Patent Owner refers discusses the
"NexPress" system, and does not seem to be relevant to Dorfman.

### b.   Claims 4–8

As discussed above, claim 4 contains the steps of, *inter alia*, (1)
creating a thin Postscript file from the user-designed page layout; (2)
converting the thin Postscript file to a fat Postscript file by replacing the low
resolution images with corresponding high resolution images; and (3)
converting the fat Postscript file to a PDF file. Dorfman teaches using a
PDF-builder to create a dynamic PDF file by adding user-provided variable
data and low resolution images to a PDF template. Ex. 1007, 4:3–8, 8:1–4.
Dorfman does not teach using Postscript files, but rather teaches a workflow
based on the PDF format. Therefore, Dorfman does not teach creating a thin
Postscript file, converting it to a fat Postscript file and converting the fat
Postscript file to a PDF file.

Petitioner attempts to overcome this deficiency in Dorfman by
asserting that "it was well-known to those skilled in the art that OPI could be
carried out using either PDF files, or . . . PostScript files." Pet. 47 (citing
Ex. 1022 ¶ 130). Petitioner concludes that "[u]tilizing PostScript files in the
OPI process rather than PDF files would have been an obvious substitution
to one of ordinary skill in the art." *Id.* at 46–47 (citing Ex. 1022 ¶ 131).
That may be true with respect to the OPI process in general, but Petitioner
has not presented persuasive evidence that a skilled artisan would have made
that substitution in combination with Dorfman's system. Dorfman teaches
using the PDF format to obtain specific benefits, in addition to facilitating

IPR2014-00791
Patent 6,611,349 B1

OPI image exchange, such as ease of editing and the ability to generate a proofing version of the customized material that can be viewed locally or printed to a local printer:

> The PDF is an accepted Internet standard, very well supported by the major Internet browsers. It is device independent and provides one to one representation of how the final document would look when printed. The PDF file may be displayed in the user's internet browser using a conventional PDF reader plug-in. The PDF file can be viewed or printed to a local low resolution printer for the final proofing. If changes are required the user moves back to the main HTML page to modify the selection and/or the variable data. Then a new dynamic PDF file is generated that reflects the changes.

Ex. 1007, 4. There is no evidence that these benefits would obtain by using Postscript files with Dorfman's system. In fact, Petitioner's declarant, Prof. Lawler, testifies that there are numerous benefits to using PDF over Postscript, suggesting that a person of ordinary skill would have preferred working with PDF files rather than Postscript files. Pet. 32. Thus, there is insufficient evidence to persuade us that a person of ordinary skill would have considered using Postscript files with Dorfman's system in a way that corresponds to the steps of claim 4. For these reasons, we are not persuaded that Petitioner is reasonably likely to show that claim 4, and claims 5–8 that depend from claim 4, would have been obvious over Dorfman, Apogee, and OPI White Paper.

      *F.*    *Claim 9 — Dorfman, Apogee, OPI White Paper, and Adams II*

Claim 9 depends from claim 4. As stated above, we are not persuaded that the combination of Dorfman, Apogee, and OPI White Paper teaches or fairly suggests, e.g., converting a fat Postscript file to a PDF file. Adams II is not relied on to teach this limitation, but rather to teach the additional

IPR2014-00791
Patent 6,611,349 B1

limitation of claim 9. Pet. 59. Therefore, for the reasons set forth above, we are not persuaded that Petitioner would prevail in showing that claim 9 would have been obvious over Dorfman, Apogee, OPI White Paper, and Adams II.

### III.   CONCLUSION

For the foregoing reasons, we determine that the information presented in the Petition establishes that there is a reasonable likelihood that Petitioner would prevail in showing unpatentability of claims 10–14 of the '349 patent. We further determine that the information presented in the Petition does not establish that there is a reasonable likelihood that Petitioner would prevail in showing unpatentability of claims 4–9 of the '349 patent. The Board has not made a final determination as to the patentability of any challenged claim.

### IV.   ORDER

For the reasons given, it is

ORDERED that an *inter partes* review is hereby instituted as to claims 10–14 of the '349 patent on the following grounds:

Claims 10–14, unpatentable under 35 U.S.C § 103(a) as obvious over Jebens and Apogee; and

Claims 10–14, unpatentable under 35 U.S.C § 103(a) as obvious over Dorfman, Apogee, and OPI White Paper.

FURTHER ORDERED that no other ground of unpatentability alleged in the Petition for any claim is authorized for this *inter partes* review; and

IPR2014-00791
Patent 6,611,349 B1

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this decision.

PETITIONER:

Scott McKeown
cpdocketmckeown@oblon.com

Michael L. Kiklis
cpdocketkiklis@oblon.com

PATENT OWNER:

W. Edward Ramage
eramage@bakerdonelson.com

Samuel F. Miller
smiller@bakerdonelson.com

# EXHIBIT 3

Trials@uspto.gov
Tel: 571-272-7822

Paper 21
Entered: March 31, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

EASTMAN KODAK CO., AGFA CORP., ESKO SOFTWARE BVBA, and
HEIDELBERG, USA,
Petitioner,

v.

CTP INNOVATIONS, LLC,
Patent Owner.

Case IPR2014-00791
Patent 6,611,349 B1

Before HOWARD B. BLANKENSHIP, BENJAMIN D. M. WOOD, and
BRIAN J. MCNAMARA, *Administrative Patent Judges.*

WOOD, *Administrative Patent Judge.*

DECISION
Petitioner's Request for Rehearing
*37 C.F.R. § 42.71*

IPR2014-00791
Patent 6,611,349 B1

## I.   INTRODUCTION

### A.   Background

Eastman Kodak Co., Agfa Corp., Esko Software BVBA, and Heidelberg, USA (collectively, "Petitioner") filed a request for rehearing (Paper 12, "Reh'g Req.") of our decision, dated November 28, 2014 (Paper 9, "Decision," or "Dec.") denying institution with respect to several of Petitioner's proposed grounds of unpatentability of claims 4–9 of U.S. Patent No. 6,611,349 ("the '349 patent").   Reh'g Req. 1.   Petitioner requests that we reconsider our determination not to institute an *inter partes* review on the following grounds:   (1) claims 4–8 as obvious over Dorfman, Apogee, and OPI White Paper; (2) claim 9 as obvious over Dorfman, Apogee, OPI White Paper, and Adams II;[1] and (3) claims 4–9 as obvious over Jebens, Apogee, and OPI White Paper.   *Id.*   For the reasons stated below, Petitioner's request is granted-in-part for the limited purpose of further explaining our determination not to institute on the Dorfman grounds, and denied in all other respects.

## II.   STANDARD OF REVIEW

Under 37 C.F.R. § 42.71(c), "[w]hen rehearing a decision on petition, a panel will review the decision for an abuse of discretion."   An abuse of discretion occurs when a "decision was based on an erroneous conclusion of law or clearly erroneous factual findings, or . . . a clear error of judgment." *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1567 (Fed. Cir. 1988) (citations omitted).   The request must identify, specifically,

---

[1] Grounds (1) and (2) will be referred to as the "Dorfman grounds."

IPR2014-00791
Patent 6,611,349 B1

all matters the party believes the Board misapprehended or overlooked.
37 C.F.R. § 42.71(d).

## III.   DISCUSSION

### A.   Claims 4–9—The Dorfman Grounds

In its Petition, Petitioner alleged that claims 4–8 were obvious over
Dorfman, Apogee, and OPI White Paper, and that claim 9 was obvious over
Dorfman, Apogee, OPI White Paper, and Adams II.  Pet. 44–55, 59–60.
Claim 4 is independent, and is drawn to a "method of generating a plate-
ready file" that is "associated with page layouts" provided "from a remote
location using a communication network," comprising the steps of:
(1) "remotely providing access to imaging files for searching and retrieving
images used in the design of a page layout by a remote user;" (2)
"establishing links to said imaging files, thereby creating a *thin Postscript
file* from the page layout designed by the remote user;" (3) "parsing said thin
Postscript file to extract data associated with low resolution images and
replace with high resolution data, thereby forming a *fat Postscript file*;" (4)
"*creating a portable document format (PDF) file from said fat Postscript
file*;" and (5) "converting said PDF file to a file in plate-ready format."  Ex.
1001, 22:31–48 (emphasis added).  Claims 5–9 depend from claim 4.  *Id*. at
22:49–23:2.

Dorfman describes a "technique for easily creating and proofing
customized printed material before printing on a production printing
system."  Ex. 1007, 1 (abstract).  A user can access a template in PDF from
the system's website and modify the template by adding low-resolution
copies of selected images and other variable data, thereby creating a
dynamic PDF file representing the material to be printed.  *Id*. at 4:3–8, 8:1–

3

IPR2014-00791
Patent 6,611,349 B1

4. The PDF may be viewed or printed to a local low-resolution printer for final proofing. *Id.* at 8:4–11. The user can make any necessary changes or corrections to the PDF file from the system website and send the file "for printing using conventional printing technology where the low resolution images would be replaced by the high resolution images by an OPI . . . process before printing." *Id.* at 4:18–21, 8:23–26.[2]

In our decision on institution, we stated that Petitioner did not present sufficient evidence to persuade us that "a person of ordinary skill in the art would have considered using Postscript files with Dorfman's system in a way that corresponds to the steps of claim 4." Dec. 26. We noted that Dorfman teaches a workflow based on the PDF format rather than the Postscript format, and therefore does not teach creating a thin Postscript file, converting it to a fat Postscript file, and converting the fat Postscript file to a PDF file. *Id.* at 25. We also found unpersuasive Petitioner's assertion that "[u]tilizing Postscript files in the OPI process rather than PDF files would have been an obvious substitution to one of ordinary skill in the art." *Id.* (citing Pet. 46–47; Ex. 1022 ¶¶ 130–131). We stated that Petitioner's assertion might be true with respect to the OPI process in general, but "Petitioner has not presented persuasive evidence that a skilled artisan would have made that substitution in combination with Dorfman's system." *Id.* We explained that Dorfman's system uses the PDF format to obtain specific benefits beyond facilitating OPI image exchange, and that "[t]here is no evidence that these benefits would obtain by using Postscript files with

---

[2] As discussed in the Decision, OPI, or "Open Prepress Interface," is an "image swapping" process in which a user designs pages using low-resolution image files, which, prior to printing, are exchanged for high-resolution versions of the image files by an OPI server. Dec. 18.

IPR2014-00791
Patent 6,611,349 B1

Dorfman's system." *Id.* at 26. We noted that, on the contrary, Professor Lawler testified that there are numerous benefits to using PDF over Postscript, suggesting that a person of ordinary skill would have preferred working with PDF files rather than Postscript files, and thus would have been unlikely to modify Dorfman to use Postscript files. *Id.* at 26.

In its Rehearing Request, Petitioner asserts that we "overlooked facts" and "misapprehended the law" in declining to institute *inter partes* review based on the Dorfman grounds. Reh'g Req. 3–9. Specifically, Petitioner argues that each of the following "piece[s] of evidence" was "overlooked and not addressed by the Board:"

(1) Dorfman's page layout templates may be tailored to a specific user through the use of "variable data" (*id.* at 4 (citing Pet. 46; Ex. 1007, 7:9–27; Ex. 1022 ¶ 112));

(2) according to Professor Lawler, one of ordinary skill in the art would have understood that the "variable data provided by the users" could be "user specific images, artwork, or other types of data" (*id.* (citing Pet. 46; Ex. 1022 ¶ 112));

(3) a user of Dorfman's system "could easily and predictably" include a company's logo on a page layout, or a photo of an item for sale, by "integrating known page building operations using PostScript-based OPI with the Dorfman system" (*id.* at 5 (citing Pet. 46–47; Ex. 1022 ¶¶ 115–118)); and

(4) "[a]s taught by OPI White Paper, the traditional way of performing OPI at the time the '349 patent was filed was to create thin and fat Postscript files" (*id.* (citing Pet. 52; Ex. 1009, 12; Ex. 1022 ¶¶ 130–133)).

IPR2014-00791
Patent 6,611,349 B1

Petitioner further asserts that we overlooked the "explicit rationale as to why . . . one of ordinary skill in the art would have utilized PostScript-based OPI rather and PDF-based OPI" with Dorfman's system, i.e., "as system constraints (e.g., software constraints or file type restrictions at the printing facility) demanded." *Id.* at 5; *see id.* at 7 (alleging that one of ordinary skill would have worked with both Postscript and PDF file formats to support compatibility with "legacy systems reliant on the Postscript language").

Petitioner also contends that we misapprehended the law in denying institution of *inter partes* review of claims 4–9 based on the Dorfman grounds. *Id.* at 6. Petitioner characterizes our holding that Dorfman "disclos[es] working with PDF's as a preferred or optimal embodiment," but counters that "the prior art need not describe the claimed invention (i.e., PostScript-based OPI) as part of its preferred embodiment to render a claim obvious." *Id.* at 8.

We have reviewed Petitioner's contentions and arguments regarding the Dorfman grounds, and are not persuaded that we abused our discretion in not instituting review of claims 4–9 based on those grounds. As an initial matter, we disagree that we overlooked the alleged facts listed above. As to items (1) and (2), we noted in our discussion of Dorfman that a user of Dorfman's system can modify templates by adding low-resolution copies of selected images and other "variable data." Dec. 21. Regarding item 4, we noted in our discussion of the OPI White Paper reference that in the OPI process, a Postscript file with low-resolution images is first created, and high-resolution images replace the low-resolution images prior to final printing. *Id.* at 18 (citing Ex. 1009, 12, Fig. 2d). As for item 3, we are

IPR2014-00791
Patent 6,611,349 B1

unable to find, in any of the cited portions of the Petition or Professor Lawler's declaration, the assertion that a user of Dorfman's system could have included a logo or photo in a page layout "easily and predictably by integrating known page building operations using *Postscript-based* OPI with the Dorfman system."

We also considered Petitioner's assertion of a reason to modify Dorfman—that one of ordinary skill in the art would have utilized a PostScript-based OPI process with Dorfman's system "as system constraints (e.g., software constraints or file type restrictions at the printing facility) demanded." Reh'g Req. 5. However, as we did not elaborate on our analysis of this assertion, we grant-in-part Petitioner's request for rehearing to provide that elaboration here.

Petitioner's reason to modify Dorfman relied solely on the opinion of its declarant, Professor Lawler. *See* Pet. 46–47 (citing Ex. 1022 ¶¶ 130–131). Professor Lawler, however, did not support his opinion with any record evidence. Under 37 C.F.R. § 42.65(a), "[e]xpert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight." The lack of any citation to record evidence is particularly significant in this case because Professor Lawler did not specify the "system constraints," "software constraints," or "file type restrictions" to which he referred. Further, Professor Lawler's opinion that the use of PDF files would be constrained under certain circumstances is inconsistent with other evidence in the record. As noted above, Dorfman describes the PDF as "an accepted Internet standard, very well supported by the major Internet browsers," and "device independent." Dorfman also teaches that PDF files can be printed using "conventional printing technology." Professor Lawler

7

IPR2014-00791
Patent 6,611,349 B1

himself states that PDF "supports all of Postscript's functionality." Ex. 1022
¶ 45. Moreover, neither Petitioner nor Professor Lawler explains why
system constraints that would have required OPI image exchange using
Postscript files would nonetheless have tolerated conversion of the fat
Postscript file to PDF, as claim 4 requires.

Finally, Petitioner argues that "[t]he Board's finding that Dorfman's
disclosure of working with PDF's as a preferred or optimal embodiment
diminishes the likelihood that one of ordinary skill in the art would have
considered using PostScript files with Dorfman's system is contrary to the
relevant law [sic]." Reh'g Req. 8. However, this argument appears to be
based on an incorrect premise: that we found that Dorfman teaches using
PDF files only as a preferred embodiment. We made no such finding. Nor
would such a finding be supported by the record. The use of the PDF file
format—a PDF builder that creates a dynamic PDF file based on a PDF
template and user-entered variable data—is a necessary part of Dorfman's
"highly advantageous" proofing system that accurately depicts how the user-
customized document would look in print, regardless of the means of
printing, before the potentially costly printing takes place. Ex. 1007, 3:1–
4:21.

B.  *Claims 4–9, Obviousness over Jebens, Apogee, and OPI White
    Paper*

In its Petition, Petitioner alleged that claims 4–9 would have been
obvious over Jebens, Apogee, and OPI White Paper. Pet. 24–39. Petitioner
relied on OPI White Paper to teach creating the thin Postscript file and
converting it to a fat Postscript file, and on Apogee to teach converting the
fat Postscript file to a PDF file. Pet. 34–35. In our Decision, we stated that

IPR2014-00791
Patent 6,611,349 B1

"we are not persuaded that the combination of these references would teach or fairly suggest" the steps of claim 4. Dec. 18. We noted that "OPI White Paper does not teach converting the fat Postscript file to PDF before sending the file to a printer or imagesetter." *Id*. (citing Ex. 1009, 12, Fig. 2d). We further noted that "Apogee teaches converting incoming files to PDF *before* 'OPI image exchange.'" *Id*. (citing Ex. 1008, 6–7). We determined that "[b]ecause Apogee converts to PDF before OPI image exchange, Apogee's system would, at best, create a PDF from a thin Postscript file and perform OPI image exchange on the resulting PDF file; no fat Postscript file would be created, and therefore there would be no fat Postscript file to convert to PDF." *Id*. at 19. In response to Petitioner's assertion that there are "numerous and varied" reasons to convert Postscript files to PDF, and that each of these benefits would have motivated a person of ordinary to convert the fat Postscript file, generated at Jebens's central system, into a PDF file, we stated that "it is counterintuitive for these benefits to have motivated a person of ordinary skill to *delay* the conversion until after OPI image exchange." *Id*. Instead, we stated that "[o]ne would expect the skilled artisan to want to perform the conversion earlier in the process, as Apogee teaches, to obtain the benefits of using PDF files earlier." *Id*.

In its Rehearing Request, Petitioner alleges that that we "misapprehended Petitioners['s] arguments and overlooked certain facts in concluding that each element of claim 4 was not disclosed by the proposed combination." First, Petitioner argues that we "incorrectly import[ed] a timing requirement into the PDF conversion process disclosed by Apogee." Reh'g Req. 9. According to Petitioner, it did "not argue, nor does Apogee teach, that the conversion from Postscript to PDF must occur before the OPI

IPR2014-00791
Patent 6,611,349 B1

image swapping process." *Id.* at 12. Petitioner further contends that in pointing out this "oversight," it is "not raising a new argument," but is "simply refuting an argument raised by the Board based upon the Board's interpretation of Apogee that is unsupported by the record evidence and was never relied upon by Petitioners." *Id.* at 11.

As an initial matter, we disagree that Petitioner is not raising a new argument. As discussed below, the record evidence, including the testimony of Petitioner's declarant, Professor Lawler, firmly supports our finding that Apogee teaches converting files to PDF before OPI Image exchange. Further, it was entirely foreseeable that this teaching is relevant to whether Jebens, Apogee and OPI White Paper renders claim 4 unpatentable, considering that claim 4 indisputably requires conversion to PDF *after* OPI image exchange. Therefore, Petitioner could have, and should have, discussed Apogee's "timing requirement," or lack thereof, in the Petition.

Further, we disagree that we erred in finding that Apogee teaches converting files to PDF before OPI Image exchange. Apogee teaches that *all incoming files* "are normalized into Digital Masters in PDF format." Ex. 1008 at 3 (emphasis added). "Incoming files" means files entering Apogee's workflow; thus, the production processes that are part of that workflow—including OPI image exchange—necessarily occur after the incoming files are normalized to PDF. *See id.* (diagram showing "Apogee Normalizing" of incoming files to PDF occurring before "Apogee OPI"). Petitioner's declarant, Professor Lawler, apparently agrees. Professor Lawler describes the step that includes OPI image exchange as the "[n]ext" step after the incoming files are normalized into PDF. *Id.* ¶¶ 91–92 (citing Ex. 1008, 3–4).

10

IPR2014-00791
Patent 6,611,349 B1

Second, Petitioner argues that we committed legal error by "narrowly focusing on this alleged teaching of Apogee," i.e., Apogee's teaching a workflow in which files are converted to PDF before OPI image exchange, and in doing so "overlooked the . . . ubiquitous nature of the OPI image swapping process . . . and the familiarity [of one of ordinary skill in the art] with using both PostScript and PDF file formats, particularly in connection with OPI image exchange." Reh'g Req. 14 (citing, e.g., Pet. 9–10, 32–33). This argument is unpersuasive. There is no dispute that OPI, using either Postscript format or PDF format, was known. *See* Dec. 17–18 (describing OPI White Paper's teaching of OPI using Postscript files); *id*. at 8 (stating that Apogee teaches converting incoming files to PDF before OPI image exchange, such that Apogee "does OPI image exchange" on PDF files). But Petitioner does not explain how the knowledge of two alternative means of performing OPI image exchange teaches or fairly suggests claim 4. Claim 4 does not require OPI image exchange using PDF files at all; nor does it merely require OPI image exchange using Postscript files, but rather OPI image exchange using Postscript files, *and then* conversion of the resulting fat Postscript file to PDF.

Finally, Petitioner contends that we "mistakenly required Apogee's alleged teachings to be bodily incorporated into proposed grounds, which is contrary to well-established Federal Circuit law." Reh'g Req. 14–15 (citations omitted). However, Petitioner does not explain the basis for this contention, or state where in our decision we allegedly required "Apogee's alleged teachings to be bodily incorporated into proposed grounds." For this reason, Petitioner's argument is unpersuasive.

IPR2014-00791
Patent 6,611,349 B1

## IV.    ORDER

For the reasons given, it is

ORDERED that Petitioner's Request for Rehearing is *granted-in-part* for the limited purpose of elaborating on our determination not to institute *inter partes* review of claims 4–9 based on the Dorfman grounds. Petitioner's Request for Rehearing is *denied* in all other respects.

PETITIONER:

Scott McKeown
cpdocketmckeown@oblon.com

Michael L. Kiklis
cpdocketkiklis@oblon.com

PATENT OWNER:

W. Edward Ramage
eramage@bakerdonelson.com

# EXHIBIT 4



**PRINTING INDUSTRIES OF AMERICA** | *Advancing Graphic Communications*

Statement of Michael F. Makin, MBA

President & CEO of

Printing Industries of America

Before the

Senate Committee on the Judiciary

"Protecting Small Business and Promoting Innovation by
Limiting Patent Troll Abuse"

December 17, 2013

## I.   **Introduction**

Thank you, Chairman Leahy and Ranking Member Grassley. It is a privilege to address the members of the Judiciary Committee on an issue very near and dear to the printing industry in America. Protecting small business and promoting innovation are passions of mine; therefore, I am pleased the Committee is examining the harm caused to both by abusive patent practices in this country.

Pure and simple, printers promote free speech.  Our mission is entirely compatible with the promotion of progress and the useful arts which is the constitutional beacon of this nation's copyright and patent laws. Print is also the proverbial "poster child" for Main Street and small business.

Today I'm speaking on behalf of America's largest trade association representing the printing and graphic communications industry. There are more than 30,000 individual printing plants in this country in virtually every city and town in America. The average printing company employs just 27 workers and more than 60 percent of printing companies are family-owned businesses – a statistic to which I know the Chairman can relate personally. In aggregate, we employed over 800,000 workers and in 2012 shipped over $147 billion in products.

Print is an historic industry that traces its roots to Johannes Gutenberg and Benjamin Franklin; yet, its modern face is high-tech and innovative – it must be in order to survive. Today's print marketplace is all about using a cross-media mix to drive the economy. Companies are transforming themselves well beyond the traditional stereotype of a printer. They set up digital storefronts to make it easy for customers to order print over the Web; execute personalized marketing campaigns for customers that integrate print, digital communications, and social media; and offer a host of other services such as database management and fulfillment. Digital printing as a process has grown from just under one percent of the overall printing industry in 2009 to 10.6 percent in 2010 – and continues to be one of the fastest growing segments in our industry. In fact, many printing firms are changing their company names to reflect the new world of integrated communications.

Unfortunately, we're also an industry that has attracted the damaging attention of patent assertion entities (PAE) or "patent trolls." I realize that there is no concrete legal definition of a patent troll, so my testimony will be based on the belief that a PAE is a company whose business model is to obtain patents primarily to pursue licensing fees and/or litigation against manufacturers that are already using a patented technology. Patent trolls in our estimation do <u>not</u> innovate, do <u>not</u> promote economic growth, and do <u>not</u> contribute to the greater good of education or scientific research. Most importantly, patent trolls do <u>not</u> create jobs – <u>our businesses do</u>.

Patent trolls are increasingly aggressive and more and more predatory. A study commissioned by the US Government Accountability Office found trolls now account for almost 60 percent of patent infringement lawsuits in America. In 2011, patent troll activity cost the US economy $80 billion dollars and productive companies made $29 billion in direct payouts. In 2012, trolls sued more <u>non</u>-tech companies than tech, spanning a wide range of industries. Given all of this activity, it was only a matter of time before trolls began targeting America's quintessential small business industry – the printing and graphic communications industry – an industry in transition and one which employs new developing technologies every day.

## II.   Patent Trolls Target the Printing Industry

Prior to 2013, it was relatively unknown for printing companies to be accused of patent infringement. That is no longer the case. Owners of patents covering Quick Response (QR) codes, scanning, computer-to-plate workflow, and online ordering are all approaching printers demanding a licensing fee or threatening costly litigation. Currently we know of eight patent owners – many of which may be considered trolls – that are seeking licensing fees from printers. All encounters follow a similar path, with printers receiving a mailed letter, often from an attorney, alleging infringement of a specific technology used in the company's administration, production, or customer communications. The letter briefly describes the patents and technology in question and offers to provide a license for their continued use. The fee may be identified and the threat of a lawsuit is either stated or implied. Rarely will the patent owner provide specific evidence of infringement and the specific claims at issue.

For small printers especially, this is often their first experience with patent law and civil litigation – not to mention "trolling" – and they are astounded at the dollar figures included in these demand letters. One common demand letter issued to a Kansas printer with just 40 employees asked for a $75,000 licensing payment within two weeks of issuing its notice; after two weeks, the letters indicated the amount would rise to $95,000.

Needless to say threats of litigation are intimidating and place undue stress on an industry already struggling with low profits and challenging demand.  The general estimate is that printers are forced to spend between $10,000 to $15,000 initially just to hire lawyers to investigate the claims of their apparent infringement. This is on top of anywhere from 125-150 hours printers must devote to this activity. One of our members in Colorado reports that he has a two-inch pile of patent claim charts on his desk; his company is already in its six month of ongoing patent troll activity.

Keep in mind, Mr. Chairman, that these are job creators in the manufacturing sector; these are <u>not</u> attorneys. Yet, there are now dozens upon dozens of printing company owners who have been forced to become patent ligation experts.  As the president of one Virginia printing company aptly stated: "Patent trolling is a colossal distraction and…a drain on everybody."

### III.    Patent Trolls Chill Growth & Innovation in the Printing Industry

In our estimation, the stock-in-trade of patent trolls are software- and computer-related patents that have broadly written claims addressing the method of accomplishing certain activities. The patents are often years old with trolls asserting that their patents cover technology that has already advanced a generation or two since the patent was issued. In my written statement, I've included a chart that details the known patent infringement actions against the printing industry, but I would like to highlight three examples:

*Computer-to-Plate Technology*: This patent relates to how a digital file, like a PDF file, is handled and manipulated in a print production operation up until the time it is used to image a printing plate. This method of digital workflow and plate imaging was new in the 1990s when the patent was issued but has

become ubiquitous in the industry now. We believe there is compelling evidence to support that it should never have been issued to begin with and have a petition to this effect before the United States Patent & Trademark Office (PTO). Fast forward 15 years later, however, and a shell company run by lawyers, which acquired the antiquated patent and which has no technological or innovative tie to the patent, has issued demand letters to printers all over the United States seeking licensing fees or threatening litigation. At least 35 of these companies have been sued.

*Web-to-Print Technology*: In this case, the combined patents describe the use of an on-line system for pricing and accepting orders, accepting payment, checking inventory, preparing shipments and more. Thousands of companies inside and outside of the printing industry use this general method of accepting orders on-line today. To date, we know of seven printers – that have been sued based on this technology. Ironically, they are being sued based on technology methods invented in the mid-1990s to accept orders for products other than what our members produce. Essentially, the claims are from a pre-Internet era where nobody used a web portal to conduct business. The patent troll in this case will not even reveal how much the licensing fee is until a printer signs a non-disclosure agreement with it. So far, the printers in question have refused to sign.

*QR Code Technology*: This patent deals with a use of an "indirect link" – using a short URL, such as TinyURL, bitly, or any other shortener in a QR Code. Quick Response Codes are proven to make print advertisements and/or product packaging more effective. In fact, I would bet if you perused the advertising mail delivered to your homes today, you would find a printed catalog, a sales circular, a coupon, or even a political fundraising envelope with a QR Code on it. QR Codes are also commonly used in printed magazines and on billboards. The patent infringement cases related to these patents made news this year when well-known craft store chain Michael's was hit with a lawsuit for using QR codes in its printed circulars. Other brand name companies, such as Taco Bell and Bed, Bath & Beyond, have been sued as well. In an effort to embrace cross-media offerings that link printed material to mobile devices, printers flocked to offer QR codes and purchased the technologies and software from leading multi-billion dollar software companies. The current threat of litigation, though, now means that small printers may have to pull back on this competitive, high-tech offering due to it

becoming a litigation trap. If you're a small business owner with no in-house attorney, is it worth the risk of being targeted?  Many have concluded it is not.

I cite these three examples because, Senators, I can assure you that if you ask small printers in the states you represent, the vast majority will tell you they consider using the above technology essential to their business growth and success. That they now even fear being competitive because of patent trolls who have no intellectual or innovative skin in the game is reprehensible in our view.

## IV.   Legislative Solutions to Combat Patent Troll Attacks on Printing Industry

Printing Industries of America commends this Committee for exploring legislative solutions to address the complexities of patent law, and we encourage a healthy debate on these ideas. Our overriding view is that legislation should deter patent trolls from the outset to protect printing companies from ever becoming part of the cycle of abusive patent litigation. However, if printers do in fact find themselves involved in extortionate legal situations, we hope that new laws will be in place to provide less costly, less burdensome courses of defense.

Solutions we support include:

Bad Faith Demand Letters
One of the fundamental problems with the current patent litigation system is the inherent vagueness that permeates it.  Parties are able to send ambiguous letters en masse to industry members, such as those I have described received by members of the printing industry, demanding exorbitant sums of money.  If a member company should have the fortitude to refuse these demands, they learn little more about the patent in question, the nature of infringement, or the party asserting the patent in the notice of suit.  We believe a simple solution to this is to require parties asserting patent rights to include more information, both in the demand letters and in the pleadings they file.

Section 5 of S. 1720, the Patent Transparency and Improvement Act of 2013, introduced by Senators Leahy (D-VT) and Lee (R-UT), is directed at

fraudulent or misleading patent demand letters.   Specifically, it is focused on the increasingly common practice of PAEs blanketing entire populations of potential patent infringers with unspecific written notices of potential infringement seeking remuneration.  Oftentimes, these demand letters don't include information as to what the allegedly infringed patent covers or what the party receiving the notice is doing that infringes upon it.

Section 5 clarifies that the Federal Trade Commission (FTC) has the authority to target such abusive conduct as an unfair and deceptive trade practice.  It is carefully crafted to avoid impinging on legitimate licensing activity by inventors and patent owners seeking to protect their rights.  Because the FTC's mission is to prevent business practices that are deceptive of unfair to consumers, and to accomplish this without unduly burdening legitimate business activity, we believe that it is appropriate to enhance its enforcement authority.

This deceptive behavior at the core of bad faith demand letters is unacceptable.  It does nothing to further the "arts and sciences" as the Founding Fathers envisioned of our patent system, but rather is increasingly the source of drag on our economy.

Heightened Pleading Requirements

Unfortunately, though, the lack of information in demand letters seems to be just the beginning of where the current patent litigation system falls short, in terms of providing information to the parties experiencing it.  Another area that we believe could be improved is the pleading standard for patent infringement cases, which is currently far too low.  Under current law, a patentee may file a complaint for patent infringement merely alleging that: (1) the court has jurisdiction; (2) the plaintiff owns the asserted patent; (3) the defendant is infringing that patent; and (4) the plaintiff notified the defendant of the alleged infringement.  With respect to the third allegation (the statement of infringement), a patentee need assert only that the defendant has imported, made, used, sold, or offered to sell a product "embodying the patented invention."   These sparse allegations fail to provide any notice as to what the patent actually covers, let alone what the defendant is doing that allegedly infringes upon it.  This information is materially important for anybody, and

certainly member companies in the printing industry that are not as familiar with the patent system, to craft a response and legal strategy.

Section 2 of S. 1013, the Patent Abuse Reduction Act of 2013, introduced by Senator Cornyn (R-TX), requires more robust pleading requirements of patent infringement complaints to ensure that defendants are provided with full and fair notice of the asserted patent claims, the accused products, and the plaintiff's element-by-element infringement contentions for each accused product. We believe that this provision will not only inject balance into the patent judicial system, but will actually improve the quality of patent litigation. Requiring parties asserting patent rights to conduct a proper pre-filing investigation will limit the number of frivolous and baseless suits ever initially filed in our courts as well as put accused infringers immediately on notice of the patentee's infringement theories. This helps all interested parties—including the district court—understand the scope of the case from the start.

<u>Customer Stay</u>

We believe that it is imperative for legislation to address the sharp rise in the number of patent suits brought against end-users over the past several years. We have personally experienced the increasingly common PAE tactic of filing patent infringement suits against customers and/or users of a product or service, rather than the manufacturer or primary seller of the product or service. This is the nature of most of the suits brought against our smaller members. In testimony before the House Committee on the Judiciary on March 14, 2013, a member of this panel (Philip S. Johnson, Johnson & Johnson) aptly explained the prejudicial and coercive effects of current troll tactics to bring lawsuits against large numbers of printers, retailers and other end users rather than an original manufacturer:

> "This tactic takes advantage of the fact that such suits threaten defendants with the disruption of aspects of their businesses that are at best tangentially related to the invention which is the subject of the patent, and that each individual defendant has less motivation to litigate the issue to final conclusion that the manufacturer of the product at issue. The result can be to collect enormous sums as the result of a very large

number of small settlements whose cumulative value far exceeds the amount that could have been recovered from the original manufacturer."

In practical printing industry terms, our member companies are saying, "We didn't write the code, we didn't develop the process,we didn't steal someone else's idea. Instead, we purchased software from billion dollar corporations who may or may not indemnify us…And even if they do, I'm still going to spend tens of thousands of dollars." A small printer in Kansas sums it up this way: "Everything I've done in this business has been 'by the book.' We go out and find a reputable vendor who has the technology we need and then we always buy the licenses and the maintenance agreements that go along with it. And now we're essentially being told by the troll 'we don't care what you did, you're doing it wrong'."

We believe that Section 5 of S. 1720 is a step forward in addressing these concerns.   Although the courts currently may stay an infringement suit brought against customers and users down the distribution chain in favor of a suit against the manufacturer or supplier, many courts choose not to do so.  Section 5 is designed to protect customers, who are targeted in patent infringement lawsuits by permitting the case against them to be stayed while the manufacturer litigates the alleged infringement.

Covered Business Method
Assertion of low quality, functional patent claims brought by trolls is another problem area that our member companies have faced first-hand this year. While Printing Industries of America was not involved in the patent reform debate last Congress, I do understand that the Covered Business Method (CBM) review program was implemented as part of the America Invents Act (AIA) as a solution to make it easier to have PTO review overbroad patents. CBM review offers an alternative to exorbitant litigation costs and allows businesses threatened over the same patent to pool resources to jointly file a CBM petition. However, the AIA limited CBM review to financial services patents that are non-technical. It is also a temporary program that ends in the year 2020.

On June 4th, 2013, the White House Task Force on High-Tech Patent Issues announced Executive Orders related to patent trolls. The White House